[L. A. No. 6990. In Bank.—July 9, 1923.]

IRENE M. MOHN, Respondent, v. KATHERINE TING-
LEY, Appellant.

[1] STATUTE OF LIMITATIONS—PLEADING—AMENDMENT OF COMPLAINT
—RELATING BACK TO FILING OF FIRST COMPLAINT.—If an original
complaint fails to state a cause of action and a new or different
cause is not set up by an amendment to it, but new matters are
added therein merely to make the original cause complete, the
amendment, though made after the expiration of the period of
limitations, relates back to the time of the filing of the first
complaint.

[2] ID.—ALIENATION OF AFFECTIONS.—In an action by a wife for dam-
ages for the alienation of the affections of her husband, no new
or different cause of action is set up in an amended complaint
filed to correct a defect in the original complaint which failed to
allege that the husband actually left the wife.

[3] ID.—ACCRUAL OF CAUSE OF ACTION.—In such a case the wrong
complained of consists of the "abduction" of the husband, and his
being actually taken away from the wife constitutes a part of
the wrongful act, until which the statute of limitations cannot
begin to run; and where an action on such cause of action is com-
menced within one year from the date when the husband is
alleged to have left the wife it is not barred by the statute of
limitations.

[4] SUMMONS — SERVICE — PUBLICATION — AFFIDAVIT — NONRESIDENCE.
The statement in an affidavit for publication of summons that the
defendant sought to be thus served is a resident of another state
and not a resident of this state is a sufficient basis for an order
for publication of summons.

[5] ID.—ORDER FOR PUBLICATION. — An order for the publication of
summons is not insufficient because it fails to indicate that the
court had read the verified complaint, it fully appearing by the
verified complaint on file, referred to in the affidavit for publica-
tion, that a cause of action exists in favor of the plaintiff and
against the defendants.

[6] ID.—PARTIES — HUSBAND AND WIFE—JUDGMENT.—While the trial
court has no jurisdiction to render a personal judgment against
a defendant who is a nonresident of the state and served with
summons by publication, in an action by a wife for alienation of
the husband's affections, where the purpose of making the party
a defendant is in order that he may assist his wife in making her
defense, and he is served in the manner provided by law, the ques-
tion of extraterritorial jurisdiction is not involved in the case.

[7] ID.—DEFAULT—RESERVICE.—The contention cannot be sustained in such case that the defendant husband's default having been entered upon the first publication of summons he was put out of court and that a subsequent publication of summons was void, where the default order was vacated and entirely new proceedings instituted for service upon him.

[8] DIVORCE—SECTION 61, CIVIL CODE—PROHIBITION ON SECOND MARRIAGE WITHIN YEAR OF DIVORCE.—Section 61 of the Civil Code, as it existed in 1900, providing that the subsequent marriage contracted by a divorced person during the life of the former spouse should be illegal and void unless the decree of divorce was rendered at least one year prior to such subsequent marriage, had no extraterritorial effect, and a marriage performed outside of the state in defiance of its terms was valid and binding and recognized in this jurisdiction.

[9] NONSUIT—RES ADJUDICATA.—A nonsuit suffered for any cause is not a bar to a subsequent suit on the same cause of action.

[10] ALIENATION OF AFFECTIONS — HUSBAND AND WIFE—RELEASE OF SUPPORT — RIGHT TO AFFECTION, COMFORT, SOCIETY, AND PROTECTION.—A contract between a wife and a third party under which the third party agrees to pay the wife a monthly amount in consideration of which she agrees to dismiss a pending action for separate maintenance against her husband and waives all claim to his property and to support and maintenance in no way affects her right to her husband's affection, comfort, society, and protection and a third party is not exempt from liability for depriving her of them.

[11] ID.—ACTION FOR DAMAGES — SUFFICIENCY OF EVIDENCE.—In this action for damages for alienation of affections it is held that the evidence is sufficient to support the verdict.

[12] ID.—REVIEW OF EVIDENCE BY APPELLATE COURT.—It is only when the question is presented to the supreme court as one of law that it will examine the evidence to see whether it is sufficient to support the verdict or finding, and when it is satisfied that substantial evidence exists its examination ceases at once.

[13] ID.—ARGUMENT—INSTRUCTION—RECORD.—If a party feels that he is prejudiced by argument of opposing counsel to the jury, the trial court should be requested to instruct the jury to disregard the objectionable matter; where this is not done such argument printed in a brief on appeal, being no part of the record, will not be considered.

---

10. Right of wife, under modern married women's acts, to sue for alienation of the affections of her husband, notes, 6 Ann. Cas. 661; 8 Ann. Cas. 674; 14 Ann. Cas. 47; Ann. Cas. 1912C, 1179; Ann. Cas. 1916C, 748; 4 L. R. A. (N. S) 643; 29 L. R. A. (N. S.) 842;

[14] ID.—EVIDENCE — INTERFERENCE WITH DOMESTIC AFFAIRS.—In an action for damages for alienation of affections of a husband, where the theory of the respondent is that appellant's interference in her domestic affairs was the result of her activity as the head of a society of which the husband was a member, and the evidence as a whole shows indisputably that appellant, as the head of the society, exercised an extensive control over the members and that she was the dominating influence in the society, it being impossible to distinguish between appellant's official acts and those done in her private capacity, testimony of donations made by the husband to the society and of assistance of appellant in the conduct of respondent's household affairs is competent.

[15] ID. — CONDUCT OF PARTIES OVER PERIOD OF YEARS. — In such a case testimony showing the course of conduct of the parties during the years immediately preceding the disruption of the household is admissible, where it is shown that the influence of appellant over the husband extended over a long period of years and that one motive for animosity on appellant's part toward respondent grew out of events happening long before the husband left the wife.

[16] ID.—EVIDENCE — PREJUDICING JURY — ADMISSIBILITY.—In such a case, where certain evidence was admissible, the fact that it tended to stir up the prejudice of the jury and arouse sympathy in the wife's favor was no reason for its rejection.

[17] ID.—VERDICT—PASSION OR PREJUDICE.—The question of whether or not a verdict was arrived at because of passion or prejudice, in a · case where the amount of the judgment was in the sound discretion of the jury, is primarily one for the trial court upon a motion for a new trial based upon that ground; and it is held in this case that under the evidence it cannot be held on appeal that the verdict was so arrived at.

APPEAL from a judgment of the Superior Court of San Diego County. W. P. Cary, Judge. Affirmed.

The facts are stated in the opinion of the court.

A. J. Morganstern, Iverson L. Harris, Victor E. Shaw and Hewlings Mumper for Appellant.

Charles C. Crouch, Hugh A. Sanders and Wright & McKee for Respondent.

17. Excessiveness of damages in action for alienation of affections or criminal conversation, notes, Ann. Cas. 1912A, 950; 42 L. R. A. (N. S.) 582.

LAWLOR, J.—This action was brought by the plaintiff, Mrs. Irene M. Mohn, to recover damages from Katherine Tingley, defendant, for the alienation of the affections of her husband, Dr. George F. Mohn. Defendant Philo B. Tingley, Katherine Tingley's husband, was joined as a necessary party by amendment to the complaint, and was served with summons by publication. He having failed to appear, judgment was taken against him by default, from which he has not appealed. The jury returned a verdict against Katherine Tingley and found specially that she knowingly and intentionally enticed plaintiff's husband away from her, and that the affections of plaintiff's husband were alienated from her. Plaintiff was granted compensatory damages in the sum of $75,000 and punitive damages in the sum of $25,000. From judgment rendered thereon defendant takes this appeal. Her principal contention is that the evidence is insufficient to support the verdict. Before considering that question, however, it is necessary to determine certain points which involve respondent's right to maintain the suit.

1. It is contended by appellant that the action is barred by the statute of limitations. First, it is claimed that inasmuch as the asserted period of the statute of limitations ran between the filing of the original and the second amended complaint the latter cannot be held to relate back to the former in which no cause of action was stated. [1] It is settled in this jurisdiction that if an original complaint fails to state a cause of action and a new or different cause is not set up by the amended complaint, but new matters are added therein merely to make the original cause complete, the amendment, though made after the expiration of the period of limitations, relates back to the time of the filing of the first complaint. (*Ruiz* v. *Santa Barbara Gas etc. Co.*, 164 Cal. 188 [128 Pac. 330].) [2] No new or different cause of action was set up in the second amended complaint in the case at bar. As in *Oberkotter* v. *Woolman*, 187 Cal. 500 [202 Pac. 669], the cause of action was at all times one based on slander, so here it was at all times one based on the alienation of the affections of the plaintiff's husband. Although the original complaint was defective in that it did not allege that Dr. Mohn actually

left respondent, this is no more serious a defect than a failure to allege nonpayment of a promissory note, the addition of which allegation was held not to change the cause of action in *Rauer's Law etc. Co.* v. *Leffingwell,* 11 Cal. App. 494 [105 Pac. 427].

[3] 2. The second claim is that in an action of this kind the statute begins to run not from the time one spouse actually leaves the other but from the time of the commission by the defendant of the act which ultimately causes the spouse to leave. Supporting this contention are cited *Hecht* v. *Slaney,* 72 Cal. 363 [14 Pac. 88], and other cases of a similar nature which it is insisted are fairly analogous to the case at bar. In *Hecht* v. *Slaney, supra,* it was held that the statute runs in favor of one chargeable as the trustee of an implied trust, and that it is not necessary for him to have denied or repudiated the trust in order to set the statute in motion; that, "In such a case the statute begins to run when the wrong complained of is done." These cases are not authority for appellant's contention. They hold in each instance that the statute runs from the time the particular wrongful act was committed; that is, from the time the cause of action accrued.

In the action before us the wrong complained of consists of the "abduction" of the husband (Civ. Code, sec. 49), and his being actually taken away from the wife constitutes a part of the wrongful act (*Humphrey* v. *Pope,* 122 Cal. 253 [54 Pac. 847]). Until that occurs the statute of limitations cannot begin to run. This action was commenced within one year of the date respondent's husband is alleged to have left her and consequently within the period of the statute, whether the period of limitations is one year under section 340, subdivision 3, of the Code of Civil Procedure, or two years under section 339, subdivision 1, as contended by respondent.

3. Appellant's third contention is that as she is a married woman her husband was a necessary party to the action; that the court never acquired jurisdiction of the person of her husband, defendant Philo B. Tingley, and therefore could not lawfully proceed against her. Defendant Philo B. Tingley was served with summons by publication and it is contended such service was invalid because the action is one *in personam* and because the affidavit and

order upon which publication was made were for various reasons insufficient.

[4] The main point made is that the facts stated in the affidavit for the publication are insufficient to justify the order for publication. It is averred in the affidavit that Philo B. Tingley is a resident of the state of New York and not a resident of the state of California. This statement is a sufficient basis for an order of publication of summons (*Parsons* v. *Weis,* 144 Cal. 410 [77 Pac. 1007]; sec. 412, Code Civ. Proc.). The affiant also sets forth the basis of this direct statement by showing that the previous copy of the summons and complaint mailed to Philo B. Tingley at New York City had been returned by him from there to one of the attorneys for the appellant, Katherine Tingley. There was nothing in this or other statements to diminish the effect of the direct averment in the affidavit that Philo B. Tingley resided in the city of New York, outside of the state of California.

[5] It is claimed that the order for the publication of summons is insufficient because it fails to indicate that the court had read the verified complaint, and appellant cites in support of that claim the case of *Forbes* v. *Hyde,* 31 Cal. 342, 355. That case, however, was based upon section 30 of the Civil Practice Act (Stats. 1851, p. 55), which required the affidavit to state facts from which it appears that a cause of action exists against the defendant. What was said in the case of *Forbes* v. *Hyde, supra,* with relation to the affidavits upon which the order for publication was based in that case was for the purpose of showing that the complaint in that case was not treated as an affidavit within the meaning of the Practice Act even though it might have been verified. The decision in *Forbes* v. *Hyde, supra,* has no application to the case at bar, which is controlled by section 412 of the Code of Civil Procedure, under the terms of which it is sufficient if a cause of action is shown by a verified complaint on file. It fully appears by the verified complaint on file herein, referred to in the affidavit for publication, that cause of action existed in favor of respondent and against the defendants. It follows that the order for the publication of summons was properly made, and that by the publication thereof service was made upon Philo B. Tingley in the manner required

by our statutes. **[6]** The appellant suggests that the substituted service in this action was insufficient, citing *Pennoyer* v. *Neff*, 95 U. S. 714 [24 L. Ed. 565, see, also, Rose's U. S. Notes], *First Nat. Bank* v. *Eastman*, 144 Cal. 487 [103 Am. St. Rep. 95, 77 Pac. 1043], and *De La Montanya* v. *De La Montanya*, 112 Cal. 101 [53 Am. St. Rep. 165, 32 L. R. A. 82, 44 Pac. 345]. It is true that the trial court would have no jurisdiction to render a personal judgment against Philo B. Tingley in the action. The purpose of making him a party was in order that he might assist his wife in making her defense. He was made a defendant and served in the manner provided by our law, and the question of extraterritorial jurisdiction is not involved in the case. The only party bound by the judgment was present in court in California and made her defense.

**[7]** It is also claimed that as Philo B. Tingley's default had been entered upon the previous publication that he was thus put out of court and the subsequent publication was void. The default order had been vacated and entirely new proceedings were instituted for service upon the defendant Philo B. Tingley. He had the right to appear within the time limited in the summons, notwithstanding the previous entry and vacation of default based upon a previous service of summons upon him.

**[8]** 4. It is contended on behalf of appellant that respondent cannot be heard in the courts of this state to assert a claim growing out of her marriage to Dr. Mohn, for the reason that their marriage was consummated in contravention of the laws of this state. The facts are these: Respondent was first married to William Farley Neill at St. Paul, Minnesota, in 1890. She brought an action against him for divorce in this state and in October, 1900, she obtained a decree and the custody of their only child, Isabel Neill. On November 28, 1900, respondent was married to Dr. Mohn, at Yuma, Arizona. Both parties were domiciled in Los Angeles at the time and they went to Yuma solely for the purpose of being joined in wedlock. At that time there was no provision for an interlocutory decree of divorce; section 61 of the Civil Code provided only that a subsequent marriage contracted by a divorced person during the life of the former spouse should be illegal and

void unless the decree of divorce was rendered at least one year prior to such subsequent marriage.

This contention is groundless for it is well settled that section 61 of the Civil Code did not operate upon or affect a decree of divorce; that it was simply a prohibition upon persons after they were divorced, and, inasmuch as such prohibition could have no extraterritorial effect, a marriage performed outside of the state in defiance of its terms was valid and binding and would be recognized in this jurisdiction. (*Estate of Wood,* 137 Cal. 129 [69 Pac. 900]; *Buelna* v. *Ryan,* 139 Cal. 630 [73 Pac. 466]; *Deyoe* v. *Superior Court,* 140 Cal. 476 [98 Am. St. Rep. 73, 74 Pac. 28]; *Grannis* v. *Superior Court,* 146 Cal. 245 [106 Am. St. Rep. 23, 79 Pac. 891]; *Pereira* v. *Pereira,* 156 Cal. 1 [134 Am. St. Rep. 107, 23 L. R. A. (N. S.) 880, 103 Pac. 488]; *Estate of Elliott,* 165 Cal. 339 [132 Pac. 439].) Appellant relies on *Wood* v. *Estate of Wood,* 137 Cal. 148 [69 Pac. 981], wherein a widow who had married the decedent within one year of her divorce sought to enforce against her deceased husband's estate an antenuptial contract settling property rights. Plaintiff based her right to compel performance of the contract upon the proposition that she had executed it by marrying the decedent, but it was held that the consideration for the contract rested in a violation of the law of California and that the court would not lend itself to the enforcement of such an agreement. However, that case dealt only with the contract for a property settlement, and the court expressly stated that the marriage itself was valid. Such a marriage being recognized in this state, it is entitled as well as any other to the benefit of all the safeguards which the law has established for the protection of the relationship, including the one invoked herein.

[9] 5. It is insisted the trial court erred in striking from appellant's answer, upon respondent's motion, that portion in which she set up a former adjudication of the action as an affirmative defense. A prior action had been instituted between the same parties upon the same cause of action, in which respondent was nonsuited upon the grounds that the evidence was not sufficient to prove the cause of action and that it showed she was not the wife of Dr. Mohn, and that if she was his wife, she was entitled

to no relief from the courts of this state because the marriage was in evasion of its law. Appellant claims that so far as the motion for a nonsuit was granted with respect to the marriage, the judgment of the lower court became final when the time to appeal therefrom expired and became available to appellant as a defense in this case. This contention is without merit, for it is thoroughly settled that a nonsuit suffered for any cause is not a bar to a subsequent suit on the same cause of action. (*Gates* v. *McLean,* 2 Cal. Unrep. 636 [9 Pac. 938]; *Merritt* v. *Campbell,* 47 Cal. 542; *Fleming* v. *Hawley,* 65 Cal. 492 [4 Pac. 494]; *City and County of San Francisco* v. *Brown,* 153 Cal. 644 [96 Pac. 281].)

[10] 6. The next contention of appellant it that respondent's right to recover is barred by a contract between Dr. Mohn and a certain "School of Antiquity" as parties of the first part, and respondent as party of the second part, dated December 21, 1918, wherein it was provided in effect that an indebtedness of $131.58 per month owed by the "School of Antiquity" to Dr. Mohn should thereafter be paid to respondent, in consideration of which respondent agreed to dismiss a pending action for separate maintenance she had brought against Dr. Mohn, and whereby she in effect waived all claim to Dr. Mohn's property and to support and maintenance. Appellant claims that this contract amounted to a surrender of all the rights to which respondent was entitled as a wife and that she could not compel anyone to pay damages for an injury to a right which she had renounced. It requires but a statement of the agreement to demonstrate that it does not in any way affect the cause of action here sued upon. The contract was simply a provision to insure respondent her support and maintenance in return for which she relinquished certain rights in his property. It in no way affected her right to Dr. Mohn's affection, comfort, society, and protection, and did not exempt appellant from liability for depriving her of them.

[11] 7. The next point presented is as to the sufficiency of the evidence to support the verdict, and to justify the court in denying appellant's motions for a nonsuit and a directed verdict. We may remark at the outset that the record is voluminous; that upon the trial counsel for the

respective parties brought out in detail countless events which might bear upon the relationship between appellant, respondent and Dr. Mohn, and that upon appeal they have argued the question of the sufficiency of the evidence minutely and at great length. This has been done notwithstanding it is not the province of appellate courts to weigh the evidence or determine the credibility of witnesses, but simply to decide whether there is evidence sufficient as a matter of law to support the verdict. [12] "It is only when the question is presented to this court as one of law under the contention that the evidence is insufficient to support the verdict or finding that this court will examine the evidence to this sole end, and when it is satisfied that substantial evidence exists to support the verdict or finding, its examination ceases at once." (*Estate of Moore*, 162 Cal. 324 [122 Pac. 844].) Appellate courts are "not concerned with the question of the preponderance of the evidence or as to the substantial character of the showing made by the defendants, but the single inquiry is, Does the record contain any evidence tending to support said findings?" (*Davies* v. *Angelo*, 8 Cal. App. 305 [96 Pac. 909]. See, also, *Larco* v. *Roeding*, 1 Cal. Unrep. 438.) This well-established rule is stated because appellant repeatedly directs attention to such testimony, for instance, as that of witnesses whose statements under the rule of conflict we must assume were accepted by the jury.

According to the evidence appellant was the "Leader and Official Head" of the International Theosophical Society. As already stated, respondent and Dr. Mohn were married on November 28, 1900. They had both been interested in theosophy for some time, but shortly before their marriage Dr. Mohn was expelled from the Los Angeles lodge. When that happened Mrs. Mohn, then Mrs. Neill, withdrew from the organization and there followed a period during which they dropped the study entirely. About that time appellant sent for respondent through a Dr. Beach, asking her to come to Point Loma, the headquarters of the society, and to bring her little girl with her. In their interview appellant asked respondent about Dr. Mohn's finances, how much money he had, and how much property he was likely to inherit. Appellant told her that she disapproved of the marriage, that Dr. Mohn would not marry her anyway

"because he is not truthful," and further that Dr. Mohn had children that were not legitimate. Appellant argued with respondent and tried to prevent her from leaving, stating that if she remained her daughter would have unusual advantages in appellant's educational institution. Despite these representations respondent left. Just prior to that time Dr. Mohn had been to Point Loma and upon his return he avoided respondent. Later he told her the conversations he had with appellant were responsible for his ignoring her the way he did. But notwithstanding appellant's opposition respondent and Dr. Mohn were married. According to respondent this relationship was characterized by mutual admiration and love; they were congenial, had similar tastes, and their life together was happy.

Shortly after her marriage respondent was subpoenaed as a witness in a libel suit which appellant brought against the "Los Angeles Times." (*Tingley* v. *Times-Mirror Co.,* 144 Cal. 205 [77 Pac. 918], 151 Cal. 1 [89 Pac. 1097].) Her deposition was taken in which she indicated that conditions were not of the best at Point Loma. Dr. Mohn was absent at the time the deposition was taken. Upon his return he stated to respondent that he considered the incident unfortunate, but did not accuse her of falsifying. They had no trouble over the deposition and it was not discussed again by them until 1906.

In the latter part of 1905 Dr. Mohn, unknown to respondent, made two or three trips to Point Loma at appellant's invitation. In December of that year he made a trip to Lower California and stopped off at Point Loma for the holidays, following which respondent noticed a change in his conduct toward her. He urged a change of attitude on her part toward theosophy; he said he must go to Point Loma to live; and suggested that they save money in order to go there. He declared that he could not leave without her but that with her attitude toward the work she could not go. He was unhappy and morose and talked to respondent about the matter all the time, urging her to do something so that they could go to Point Loma. He began to criticise respondent's daughter, Isabel Neill, although previously he had spoken of her as "about perfect."

Respondent finally wrote appellant a letter which Dr. Mohn suggested, saying she desired to do something to straighten the matter out. The negotiations which followed culminated in appellant directing respondent to go to the office of her former attorney and make a statement retracting the testimony she had given in her deposition. Respondent's letters were written in a tone of complete submission to the wishes of appellant and with an apparent anxiety to do all she could to adjust the matter, but appellant's letters indicated an unyielding attitude on her part. Respondent told Dr. Mohn she could not retract absolutely all the statements in her deposition, but he said the only way to make it acceptable to appellant was to cover everything in a general way.

Respondent signed a statement in which she declared in substance that when she gave her deposition she might have drawn wrong conclusions from the facts as she saw them and that she was then in sympathy with the Theosophical Society. Further correspondence ensued; the Mohns made a trip to Point Loma and later moved to the "Tent Village," a place conducted by the society but which was outside the homestead proper. Dr. Mohn expressed himself as feeling more kindly toward respondent after these endeavors in his behalf. He was reinstated in the society and they lived very happily in their home outside the grounds until 1911.

In that year Dr. Mohn received about $300,000 from his mother's estate. Before then the Mohns were prevented from living inside the homestead grounds; appellant had told them it was not advisable. In that year, after he received the money, appellant opened the way and at her request the Mohns moved into the homestead, occupying a place called "North House." When they were partially settled appellant asked if she could at times entertain her friends there to have them in a homelike atmosphere. Respondent willingly acceded to the request and appellant exercised the privilege. Upon one occasion she informed respondent that two married couples would be there. They arrived and stayed almost four months. At another time appellant came to "North House" with several people and informed · respondent she would have to leave, as they wished to hold a private conference and did not want her

191 Cal.—31

there. Respondent immediately left and was kept out from 1 o'clock in the afternoon until 7 in the evening.

Appellant exercised an extensive control over the Mohn household. When Dr. Mohn's sister came to visit them she told respondent to have her sleep on a window-seat so she would not stay very long, knowing they had no place for her. The Mohns having put up some draperies while she was away, upon her return she said they were not suitable, and over respondent's protest Dr. Mohn insisted they be changed because "when she makes a request we have to carry it out." There was a similar occurrence with reference to the rugs. Dr. Mohn felt himself unable to keep an appointment with respondent in San Diego because appellant would not give him permission to leave; and for the same reason he refused to go to see a sick grandniece, and at another time a sick sister. Dr. Mohn and respondent in 1911 had agreed that they would go separately to appellant with their troubles.

Before 1911 all the parties got along agreeably with Isabel Neill, who attended the "Raja Yoga" school at the homestead. It may be said with reference to Mrs. Mohn that the evidence would justify an inference that she felt a true mother's affection for her daughter, and that everything she did was in an effort to insure her welfare and happiness. Appellant insisted that Isabel resume the name of Neill, saying it would be better, for there could be no trouble over Dr. Mohn's estate with his relations if she did that. In 1911 appellant wrote a letter to respondent in which she referred to inherited "irritated conditions" and "seeds of disease" in Isabel's system. She referred to this matter again on other occasions, notably when she told Dr. Mohn of it and said the disease was syphilis. Mrs. Mohn had a blood test of Isabel taken, which showed her to be absolutely free from this disease. Appellant told respondent that for her own protection she must keep Isabel and Dr. Mohn apart, as Isabel was growing up, and that respondent should write a letter to Dr. Mohn for Isabel to sign to the effect that she wished Dr. Mohn would not show so much affection for her. Appellant refused to let Isabel come to the Mohns' when respondent was sick, saying it was a scheme for her to be near Dr. Mohn; she also refused for the same reason to let Dr. Mohn go to San

Francisco at one time when Isabel was sick there, and intercepted a letter Isabel wrote to Dr. Mohn asking him to buy respondent a watch for her birthday. Appellant at one time said that Isabel was unbalanced. When Isabel was about eighteen years old appellant broke up a love affair between her and a young man, because she said if they were married they would not be of use in her work. One day appellant informed respondent Isabel was going away, which was the first respondent or Dr. Mohn knew of it. Dr. Mohn as well as respondent felt badly, but nothing was done, and Isabel went to Chicago to train for nursing. While she was there appellant told respondent Isabel was probably deceiving her and to have her watched by detectives, insisting that she was not conducting herself properly. The report showed Isabel was living with two other girls in a rooming-house approved by the Y. W. C. A. and that her conduct was above reproach. Although she did have some trouble which caused her to leave the hospital, it turned out not to be anything which would injure her name. Appellant wrote letters for respondent to send to Isabel, which respondent did not send because ''they did not express her sentiments.''

Isabel had been ill in Chicago and appellant told respondent in 1916 to make arrangements to have her come west. She went to San Francisco, where respondent met her and tried to arrange for her to take a business course. While in San Francisco respondent received a communication from Dr. Mohn which indicated to her that, although appellant had a great deal to do with the plan for her to go to San Francisco, Dr. Mohn was upset about it now that she was away. It became necessary for Isabel to have an operation after respondent returned to Point Loma. The expense of this, together with the way Isabel and respondent handled it, dissatisfied Dr. Mohn. It also appears that appellant was somewhat provoked because of the treatment accorded the homestead doctor in the matter. Dr. Mohn and appellant also appear to have felt some animosity toward the doctor who performed the operation. In August, 1917, Dr. Mohn signed a letter to Isabel in which he stated he did not approve of her conduct; that she was being entertained too much, and offered her an opportunity to come to Los Angeles, go to a mountain resort and rest up, after which

he would help her get a position. He said if she did not do this he could not promise to support her in the future. Appellant's secretary said that appellant dictated this letter, saying that she was doing it at Dr. Mohn's request. Isabel declined to return to Point Loma. Subsequently, appellant tried to get respondent to have a detective shadow Isabel in San Francisco, which respondent refused to do. Respondent stated that she did not get disquieting reports about Isabel other than from Dr. Mohn and appellant.

Dr. Mohn contributed most of his $300,000 to the various branches of the Theosophical Society, reserving an annual income of $4,000 for life. This income he subsequently consented to have reduced. Respondent received an allowance of $30 a month, part of which she apparently sent to Isabel. Dr. Mohn's mother had made a proposition to respondent before 1906 that if the latter would not go to Point Loma, but would stay in Los Angeles, she would leave her all her property. This offer respondent declined in order to go with Dr. Mohn. Respondent said she did not know the exact extent of his contributions to the society; that while she did not oppose them she did not encourage him to make them. Dr. Mohn became worried over finances, because, though he had put in his requisition, he had not been given his money by the manager of the homestead. He accused respondent of running up bills and of being extravagant when he had not yet secured his money to pay his taxes. Respondent went to appellant, told her of this, and also that she would like to go to San Francisco. Appellant agreed to arrange this with Dr. Mohn, saying, "He is very easy to manage; I know just how to do it," and saying she would get Dr. Mohn to give her an allowance to meet her small bills. From his subsequent treatment of her respondent learned that appellant had given Dr. Mohn opposite instructions. Two days after the conference between respondent and appellant, appellant wrote respondent a letter, ostensibly about the matter under consideration, but containing many statements of events which had never happened, and referring to respondent's feeling that she was unjustly treated by her husband. Respondent testified she had not said anything about such a matter to appellant and that this letter opened her eyes to the fact that appellant was not treating her fairly. Appellant apparently

did not settle the matter of respondent's trip to San Francisco, for Dr. Mohn said nothing about it, and when in January, 1917, respondent mentioned it to him he accused her of not co-operating with him financially, and said all she wanted of him was money for herself and Isabel. During 1916 respondent received from Dr. Mohn $254, $142.25 of which was spent in going to San Francisco when Isabel was sick in the month of May; of the balance, $85.38 was spent on herself.

By this time disagreements were arising in the Mohn household and between respondent and appellant. In the latter affairs Dr. Mohn was solicitous lest respondent offend appellant. One incident may be mentioned: The doctor who operated on Isabel in 1917 sent a bill for $400. Dr. Mohn said it was exorbitant and refused to pay it. Respondent wrote to the doctor explaining this, and saying that what Dr. Mohn wrote would be dictated by "the one who tries to control everyone's affairs here and is adverse to seeing any money go out," and by the homestead physician. Dr. Mohn compelled respondent to show this to appellant. The latter declared that this was the worst thing that had happened to her; that respondent was entering a wedge in her family; she told Dr. Mohn she had anonymous letters telling how respondent angled to get him before they were married; that respondent was an unreliable person; that she had perjured herself at a trial in the past; that she was untruthful and that he could not believe what she said. Respondent became frightened. The Mohn troubles became a chief subject of conversation at the homestead. Appellant sent a message to one woman by her secretary to the effect that respondent was out of tune and that it would not be well to be too friendly with her. When respondent refused to send a letter to Isabel, suggested by appellant, Dr. Mohn became angry; said that he proposed to get into the work deeper that ever; that appellant was the best friend they had; that he did not propose to listen to anyone slander her. He also told respondent she was mighty common truck compared to appellant.

Mrs. Davidson, appellant's secretary, testified she had heard appellant discuss respondent's character with Dr. Mohn; that appellant sent her to one of the students to tell her that respondent was out of tune with conditions

and not to be too intimate with her; that on occasions when Dr. Mohn was present appellant discussed the inharmony in the Mohn family, and that in the way she told the story she left the impression that Mrs. Mohn was to blame for it and Dr. Mohn to be excused for his mistakes.

The financial situation continued to bother Dr. Mohn and he told respondent that if she had $10,000 she probably would have left long ago. During three months in 1917 she received from him $90.35. Respondent stated that all the discord was caused by stories Dr. Mohn heard elsewhere and brought home. She stated that she was at Point Loma because he was there and that statements he heard about her wishing to go elsewhere and live with Isabel were false.

On September 21, 1917, respondent wrote a letter which she read to Dr. Mohn in order that her statements could not be misquoted later, which frankly expressed her sentiments on the subject of their domestic affairs. The tenor of the letter was one of submission and regret. She expressed a kindly feeling toward and sympathy for Dr. Mohn, a deep humiliation at having their private affairs dominated by appellant, and stated that she had no grievance against Dr. Mohn; that any misunderstanding was due to the meddlesome interference of appellant. She further suggested to Dr. Mohn that she was not being treated fairly, and that for the sake of their future domestic harmony and mutual understanding it would perhaps be well for her to go away for a short time. On October 11, 1917, Dr. Mohn suggested that each get an attorney and that they should settle the matter, but he refused to go away from the homestead to conclude the arrangements.

The next day respondent consulted an attorney, and on October 13th, she received a letter signed by Dr. Mohn in which he dwelt upon the many kindnesses he had shown respondent and Isabel and the money he had given them, and rebuked respondent for saying unkind things about appellant and for circulating false statements in her own defense. The burden of the letter was that respondent was trying to threaten him until he did for her and Isabel the things she wanted done. He offered to let her go and live with Isabel and proposed to give them money enough to live comfortably, not extravagantly; said that they might board, or hire an apartment with a kitchenette. Appellant's secre-

tary said that this letter was dictated by appellant, who explained that she was writing it because Dr. Mohn was unable to express himself clearly. Respondent insisted that appellant wrote the letter, and it does appear that in the following January Dr. Mohn asked for a copy of it, saying that he had lost his and had forgotten what was in it; that she refused to give him a copy, and that when her deposition was taken some months later appellant's attorneys produced a copy of the letter.

Dr. Mohn told respondent that either he or she would have to leave. On February 3, 1918, he told her that he was going to get out. On the following day Dr. Mohn told respondent that he was going to Los Angeles for four or five days. When she begged him to let her accompany him he declared that it was only a matter of dollars and cents with her; that if she had money she probably would have left before; that he was going to get a copy of his letter of October 13th; that their troubles were going to be settled because he was going away. When she asked to go with him he refused to answer her; he put a few things in a grip and left, saying he would send her his address. Because of statements he had made she believed he was leaving for good.

On February 20th respondent caused all the furnishings of "North House" to be moved to a house in San Diego, where she established her home and fitted up a room for Dr. Mohn. She endeavored to communicate with him through his attorney, but was unsuccessful, and he thereafter refused to communicate directly with or to return to her. A provision for her maintenance was effected by the contract heretofore alluded to.

Respondent explained that her attitude toward the Theosophical Society and her conduct in becoming reinstated was due to a desire to make her husband happy and to be with him. She stated this accounted for her retracting her affidavit, which she said she did acting wholly upon the feeling that she might have been mistaken, which retraction she signed with misgivings and only upon the insistence of Dr. Mohn. She stated she tried to be in sympathy with the work; that many of its phases were agreeable to her; that she tried to do her best to make Dr. Mohn happy; that there were months when things went smoothly; that

she was determined to try to get along with appellant, and to try to see things as Dr. Mohn did, up to a point where it was no longer possible. This feeling for a long time caused her to overlook things which were being done, which things she subsequently refused to endure.

A very important feature of the evidence consists of letters which passed between the various parties. Many of them refer to Dr. Mohn's donations. In some of them respondent expresses the warmest regard for the society and for appellant. In certain others she expresses different sentiments. Taken alone, respondent's letters might indicate that she had undergone a change of feeling after the suit against the "Los Angeles Times"; that she had entered willingly into the work; that her feeling of animosity toward appellant arose wholly after the trouble with her husband began. But viewed in the light of her explanations —that they were nearly all written at the dictation or instigation of Dr. Mohn, and that she wrote them to keep the peace—they could well have assumed a different aspect to the jury and have entirely borne out her story of the causes of her troubles. The letters which appellant wrote to respondent were full of advice and apparent goodwill, but they contained frequent references to respondent's having "perjured" herself in the "Times" trial, appellant's magnanimity in not having prosecuted her for it, statements regarding Isabel which well might have alarmed respondent, and references in a most aggrieved tone to things which respondent did which did not please appellant. Respondent insists the letters referred many times to events which had never happened; that they were written merely as records for appellant, and points out that on February 8, 1918, four days after Dr. Mohn left, appellant had four copies made of each of these letters referring to the Mohn affairs.

Appellant insists that each of these letters shows that respondent lived happily for ten years at Point Loma and then proceeded to disrupt her home. The letters, however, for a considerable period refer to some "trouble." Respondent contends this was caused by appellant and the society; appellant that it was caused by Isabel. The jury indicated by its verdict that it accepted respondent's version. It would be a hopeless task to attempt to answer *seriatim* the arguments appellant advances in this connection. Suf-

fice it to say that respondent's testimony and explanation of these matters cannot be said to be inherently improbable nor irreconcilable with the rest of her testimony.

From the foregoing evidence we are of the opinion the jury was entirely justified in its verdict. It could have been reasonably deduced from the evidence that appellant was trying to bind Dr. Mohn to the society; that she wanted him to be interested in it; that she wished him to continue his donations; that she was hostile to respondent because the latter married Dr. Mohn and because of her testimony in the "Times" trial; that she deliberately set about to prejudice Dr. Mohn against Isabel, which, in view of respondent's devotion to her, would create discord in the Mohn family; that she interfered in the Mohn household until it caused friction; that she took Dr. Mohn's part in all their domestic differences and by her actions increased them, and that she disparaged respondent to Dr. Mohn in order to prejudice him against her. This is clearly sufficient to indicate to the jury appellant's connection with Dr. Mohn's leaving home.

We are also convinced that there was evidence that Dr. Mohn actually left respondent. The only evidence that he was not leaving for good on February 4, 1918, was his own declaration that he would be in Los Angeles for four or five days and would write respondent, and his later statement that he would be home about April first. But opposed to this is respondent's testimony that from his conduct and other statements he gave her the impression that he was leaving for good; his own statement that he was going to "get out"; his previous statement that one or the other must leave; that he could not go on that way; the question put by him as to when "it would all end"; the several conversations they had had with reference to one or the other leaving; his suggestion that they hire lawyers to settle the matter; her suspicions that he was not telling the truth at the time he left, evidenced by his failure to write her, as he had said he would; the fact that he refused to communicate with her after she began her suit against appellant, and finally the circumstance that he did not come back to her, refused to do so, and went instead to the Point Loma homestead without making any effort to reunite the family. From all the circumstances we must assume

the jury did not believe Dr. Mohn's testimony that he did not leave respondent.

Counsel for appellant have devoted a brief of considerable size to the subject of "Instances in which counsel for respondent have grossly misrepresented the record, drawn unreasonable and unwarrantable conclusions, and spoken with impropriety and indecency." Portions of respondent's brief on appeal are quoted as showing wherein the testimony has been misstated. Much of the testimony so referred to we have deemed it unnecessary to incorporate into this opinion at all. As to the remainder, assuming counsel for respondent have misstated it, in arriving at our conclusion we have been careful to distinguish between argument and the testimony contained in the record.

[13] Portions of the argument delivered to the jury by respondent's counsel are objected to as being untrue, unreasonable, unsupported by the evidence, and indecent. Although counsel for respondent has printed his argument as part of his brief, it is no part of the record and we have not considered it on this appeal. Moreover, if appellant felt her cause was prejudiced by this argument, the trial court should have been requested to instruct the jury to disregard the objectionable matter, and it does not appear this was done.

Some seventy specifications of error are made to the rulings of the court on the admission of evidence. Manifestly, it is impracticable to discuss each objection separately. First, it is claimed that much of the testimony concerning the donations made by Dr. Mohn to the Theosophical Society in 1911, and that relating to the assistance of appellant in the conduct of the Mohn household affairs, was incompetent to prove an alienation of Dr. Mohn's affections, but did furnish a foundation for the creation of a prejudice against appellant. We are unable to agree with this contention. The evidence as a whole shows indisputably that appellant, as the head of the Theosophical Society, exercised an extensive control over the members and that she was the dominating influence in the society. [14] The theory of respondent is that appellant's interference in the Mohn domestic affairs was the result of her activity as the head of the society. In this situation, it being impossible to distinguish between appellant's official

acts and those done in her private capacity, the evidence was properly admitted.

[15] The next class of testimony objected to is that showing the course of conduct of the parties during the years immediately preceding the disruption of the Mohn household, such as Dr. Mohn's changed attitute after his visit to Point Loma in 1905, and the fact that before he came into possession of his property he was not permitted to live in the homestead grounds. Such matters are objected to on the ground that they are too remote in point of time. But as the influence of appellant, which is asserted to have caused Dr. Mohn to leave his wife, extended over a long period of years, and as one motive for animosity on her part toward respondent grew out of events happening long before he left, this evidence was clearly relevant.

It is asserted that much evidence, among it that indicating Dr. Mohn had shown little attention to his wife while making liberal donations to the society, was relevant "only to throw light upon the attitude of the witness' mind toward his wife and toward the defendant." Such an inquiry is permissible in actions of this kind (*Adkins* v. *Brett,* 184 Cal. 252 [193 Pac. 251]). Much of the testimony concerning Dr. Mohn's financial affairs was relevant as bearing on this question, as was also respondent's testimony concerning the circumstances under which she wrote many of the letters received in evidence and many of the statements made by the various parties which otherwise would have been hearsay.

Appellant objected to respondent's testimony that Dr. Mohn and appellant had private conversations at which respondent was not present. As respondent was testifying of her own knowledge merely as to the fact, and was not stating what occurred on those occasions, the evidence was not objectionable.

It is claimed the court erred in permitting evidence of the "alleged views entertained or statements made" by appellant concerning Isabel because it was irrelevant. In view of what we have said on this subject concerning the sufficiency of the evidence it clearly appears this was relevant.

[16] The chief objection to all the evidence of which complaint is made is that it served to stir up the prejudice

of the jury and arouse sympathy in respondent's favor. But the evidence being admissible, its effect upon the jury would furnish no reason for its rejection.

[17] 8. Appellant earnestly urges that the verdict is based on passion and prejudice. Respondent objects to any consideration of this question for the reason that no motion for a new trial was interposed by appellant. In support of the contention that no such motion was necessary it is urged that this court has jurisdiction to consider upon appeal from the judgment every question which might have been raised on a motion for a new trial; that since sections 956 and 963 of the Code of Civil Procedure were amended in 1915 (Stats. 1915, pp. 209, 328) and the remedy of appeal from an order denying a new trial abolished, an appellant would have no remedy except in the trial court if it were held necessary to interpose such a motion before raising on appeal a question which might have been considered on the hearing of the motion. Section 956 provides in effect that upon an appeal from a judgment the court may review the verdict or decision and any intermediate order which involves the merits or necessarily affects the judgment, or which substantially affects the rights of a party. The section does not authorize the court to review any decision or order from which an appeal might have been taken.

It is clear that the question of whether or not a verdict is arrived at because of passion or prejudice in cases where the amount of the judgment is in the sound discretion of the jury is primarily one for the trial court upon a motion for a new trial based upon that ground (1 Hayne on New Trial and Appeal, p. 446; *Hale* v. *San Bernardino etc. Co.,* 156 Cal. 713 [106 Pac. 83]). If a motion for a new trial upon this ground is denied by the trial court, we cannot reverse the judgment unless the amount thereof is " 'so plainly and outrageously excessive as to suggest, at the first blush, passion or prejudice or corruption on the part of the jury' " (*Hale* v. *San Bernardino etc. Co., supra*). Whether or not we can review the evidence upon the subject of damages upon an appeal from the judgment without the interposition of the motion for a new trial, where the claim is that the verdict is excessive, upon the authority of *Smith* v. *Lightston,* 182 Cal. 41 [186 Pac. 769], because such an attack upon

the judgment is based fundamentally upon the insufficiency of the evidence to justify the judgment, is a point which we need not decide, for it is clear that upon such an appeal the appellant is in no more favorable position than she would have been if she had made the motion for a new trial upon the ground that the verdict was excessive, indicating passion and prejudice, and such motion had been denied. Assuming that the rule controlling this court upon an appeal after denial of a motion for a new trial upon this ground is applicable upon an appeal from the judgment where no motion is made for a new trial, and while the verdict in this case is very large, we cannot say under the evidence that it is so excessive as to suggest, "at the first blush, passion or prejudice or corruption on the part of the jury" within the rule as heretofore announced (*Hale* v. *San Bernardino etc. Co., supra*). We would feel very much better satisfied with the matter, however, if the motion had been submitted to the trial judge, who had the opportunity of seeing the witnesses and the parties and forming his own estimate as to the damage inflicted upon the plaintiff by the defendant.

9. Finally, appellant assigns error to the giving of certain instructions to the jury, and to the refusal to give certain others. We have examined these assignments carefully and find in the instructions no error which would warrant a reversal of the judgment.

The judgment is affirmed.

Waste, J., Kerrigan, J., Seawell, J., Myers, J., and Wilbur, C. J., concurred.

Rehearing denied.