## ECLOV v. BIRDSONG.

### No. 9281.

United States Court of Appeals
District of Columbia.

Submitted Oct. 9, 1947.

Decided March 1, 1948.

Mr. James J. Laughlin, of Washington, D. C., submitted on the brief for appellant.

Mr. Joseph O. Janousek, of Washington, D. C., submitted on the brief for appellee.

Before EDGERTON, CLARK and WILBUR K. MILLER, Associate Justices.

CLARK, Associate Justice.

This is an appeal from a judgment of the District Court following the verdict of a jury and the award of damages. Birdsong sued Eclov on three counts: (1) alienation of affections, (2) loss of consortium, and (3) criminal conversation. The case was submitted to the jury under proper instructions that the second count was included in the first count and that if the jury found for plaintiff on the first count it would not be necessary for them to notice the second count or to return a verdict on it. The jury accordingly returned a verdict for plaintiff for five thousand dollars on the first count for alienation of affections and for ten thousand dollars on the third count for criminal conversation. From the judgment following that verdict, this appeal is taken.

The chief point relied upon by appellant is that the verdict was excessive. We regard this contention as wholly and totally without merit. An undisputed record showing more of shame, degradation and duplicity in marital relations has seldom been presented to this court. A more callous and arrogant attitude has never been assumed than by appellant in the case at bar. As will presently appear from our discussion of the record, in view of the depravity of appellant and the irreparable injury inflicted on appellee, we would not regard any judgment within the extreme limits of defendant's ability to pay as being excessive.

The facts as shown by the record are generally undisputed. Appellee, Birdsong, and his wife Thelma were married in 1916 and remained happily married for twenty-six years. Appellant alleges in his brief that there had been marital difficulties between Birdsong and his wife prior to the advent of Eclov on the scene. We have been unable to find a scintilla of support in the record for this allegation and appellant's attorney has refrained from making any citation to the transcript or the abstract wherein his assertion might be sustained. The Birdsongs had four sons, ranging in age at the time of the trial from a boy of 13 to a man of 28. It is undisputed that Birdsong had been a faithful and devoted husband, a hard working bread-winner and an excellent provider. His complete devotion to his wife and family is wholly unchallenged.

Sometime in 1940, Eclov, then about fifty years of age, his wife and adult daughter moved into the neighborhood where the Birdsong family resided. The two families became acquainted through neighborhood activities and their casual acquaintanceship ripened into an intimate family friendship. They appeared together socially, went out on automobile rides together, played bridge together, and frequently visited in each other's homes. Mrs. Eclov, however, was in rather bad health and frequently missed these joint social activities of the two families. Mrs. Birdsong appears to have been solicitous regarding Mrs. Eclov's health and frequently attended her in her last illness. So far as the record shows there had been nothing improper in the relations between Eclov and Mrs. Birdsong, and no rift in the lute of the Birdsongs' domestic happiness until the death of Mrs. Eclov, which occurred in March, 1942. But within two weeks of the death of his wife, Eclov induced Mrs. Birdsong to come alone to his house under the false pretense that he was sick and needed attention, and thereupon seduced her under promise of marriage.

Shortly thereafter Eclov applied to Birdsong, and undisputed testimony shows the latter was all unbeknowing and unsuspecting of the relations lately existing between his wife and Eclov, for permission for himself and his daughter to move into the Birdsong home until the event of her marriage, which was considered imminent. The friendly and credulous Birdsong agreed and the Eclovs moved into his house.

Thereupon Eclov began a systematic course of depraved conduct, constantly debauching Birdsong's wife in Birdsong's own home, gradually edging Birdsong out of his home, and finally removing Mrs. Birdsong and much of the Birdsong furniture to the house he had under lease, then occupied by his subtenants. There he installed Mrs. Birdsong after convincing her he would have easy access to her without exciting undue gossip in the neighborhood. The subtenants were instructed by Eclov to refuse to allow Birdsong to remove any of the furniture. Subsequently Eclov instructed Mrs. Birdsong as to the grounds she might use for obtaining a divorce in Florida, and it is undisputed that she did go to Florida for that purpose (withholding information from Birdsong as to her whereabouts), in August of 1943. Eclov maintained correspondence with her during her stay in Florida, but denied to Birdsong that he had knowledge of her whereabouts.

In December of 1943 Mrs. Birdsong began to suspect that Eclov's ardor for her was cooling and returned to Washington on December 9, without notifying anyone. She went immediately to Eclov and at his suggestion they went to a hotel in Silver Spring, Maryland, where he registered for them as man and wife under an assumed name. During that reunion Eclov revealed that he entertained no intention of marrying her. The following morning she went

to the residence of one of her sons and asked him to bring about a reconciliation with her husband. When this proposal was made to Birdsong he immediately acceded, quit his job in Baltimore, and took his wife and youngest son to Florida, in accordance with her desire, hopefully intending to re-establish his home. They arrived in Miami about January 1, 1944. There were numer-ous arguments centering about Eclov, and on March 17, 1944, Mrs. Birdsong left her husband again and announced her intention of seeking a divorce. Mrs. Birdsong testi-fied she took this action because she was still in love with Eclov. Birdsong tried un-successfully to dissuade her and left Florida for Washington before he was served with process in the divorce proceeding. He tele-phoned his wife from Washington, pleading with her to abandon the suit. Failing in this, he became despondent and was un-aware that she actually obtained the di-vorce. She obtained the divorce in Florida May 17, 1944, on a complaint which she herself testified she had not read, and she expressly repudiated under oath, as a wit-ness in the trial of this case, many of the allegations contained therein.

It was in evidence and not disputed that Birdsong telephoned his wife begging her to desist from her intention of getting a divorce, that he was overwhelmed with grief, and was not familiar with the pro-gress of the suit, and that he only learned of the granting of the divorce decree when so informed by third parties. When Mrs. Birdsong returned to Washington it appears that she was attempting to keep her where-abouts secret from her former husband, but he did succeed in seeing her on some two or three occasions between the date of her return and December, 1944, on which oc-casions he begged her to remarry him. She refused, however, because of her continuing infatuation for Eclov, as she testified sub-sequently. Shortly before December 13, 1944, Mrs. Birdsong learned that Eclov had completed his shameful seduction and be-trayal of her by marrying another woman. On December 13, she phoned Birdsong, re-questing him to meet her downtown on the following Saturday and Birdsong consented.

When they met, Mrs. Birdsong was in a distraught, hysterical condition and insisted on going to Birdsong's apartment in order that she might make full confession of her adulterous relationship with Eclov. She also insisted on the presence of Eclov. Birdsong went to Eclov's office and demand-ed his attendance. Eclov refused. When he returned to his own apartment Birdsong discovered a revolver in Mrs. Birdsong's purse and learned that she had planned to kill their son Phillip and then commit sui-cide. Mrs. Birdsong then broke down and made a full confession of her illicit rela-tions with Eclov. Both Birdsong and his divorced wife later testified that this was the first knowledge that the injured hus-band had of actual adultery on her part and of the extent of Eclov's infamy. Birdsong seized the revolver and rushed to her home in Riverdale, Maryland, to the protection of his son. There he found numerous letters which Eclov had written to Mrs. Birdsong.

The next day Birdsong confronted Eclov in the latter's apartment but Eclov refused to discuss the matter in the presence of his second wife and finally succeeded in getting Birdsong out of his apartment and there-upon told Birdsong to see his (Eclov's) lawyer.

At the trial no substantial effort was made to deny any of the essential parts of the evidence here summarized. When asked on cross-examination whether he and Mrs. Birdsong had committed adultery Eclov re-fused to answer on the ground that it might incriminate him, as indeed it might under the Mann Act.[1]

The record shows that Birdsong made repeated efforts to induce his former wife to remarry him and that these efforts con-tinued even after the filing of this action, but that Mrs. Birdsong steadfastly refused on the ground that in spite of Eclov's be-trayal and shameful treatment of her she still loved him.

Upon such a record, the appellant's con-tention that the verdict was excessive is absurd upon its face and amounts to at-tempted trifling with this court. Numerous cases have supported verdicts for much higher sums—under circumstances far less

---

[1] 36 Stat. 825 (1910), 18 U.S.C.A. § 397.

aggravated than those disclosed by the record before us in this case.[*] In such an action as this, a verdict will not be set aside or interfered with as excessive unless there is something to indicate that the verdict returned by the jury was the result of passion, prejudice or corruption, or it is clear that the jury disregarded the evidence and the rules of law applicable.[3] Appellant makes no pretense of attacking the verdict on any such grounds, and his contention fails completely for lack of support.

 Appellant complains that the trial court refused an instruction on condonation. There is not a scintilla of evidence in the record that Birdsong had any knowledge of his wife's adultery prior to December 13, 1944, *after she had secured the divorce;* nor is there any evidence that they ever had any marital relations after that time. On the contrary both Birdsong and Mrs. Birdsong testified to the diametrical opposite. In view of the record it would have been culpable and prejudicial error, calculated to confuse and mislead the jury, for the court to have granted any such prayer.

Appellant further strenuously complains that the court erred in refusing a prayer for an instruction on the Full Faith and Credit Clause of the Constitution, Art. 4, § 1, and that the court stopped the argument of appellant's trial counsel when he persisted in attempting to address the jury on that theory. This argument is based upon the amazing theory that because Mrs. Birdsong obtained a divorce in Florida in a proceeding in which her husband was never served with process, upon allegations which she testified under oath in this case she had never even read over and the truth of many of which she specifically denied from the witness stand, that the innocent and injured husband is prohibited from maintaining this action under the Full Faith and Credit Clause. This is reductio ad absurdum. No one was attacking the Florida divorce. No one was seeking to impeach it or to flout its effectiveness and validity. To undertake extension of the Full Faith and Credit Clause to such a situation is puerile.

Appellant also claims that the verdict is against the weight of the evidence. The summary of the record made hereinbefore shows that the evidence was overwhelming, for the most part uncontradicted, and was abundantly sufficient to support the verdict.

Appellant assigns as error in general terms the granting of instructions on behalf of appellee and the refusal of instructions prayed for by appellant. Without going into unnecessary detail as to all of the large number of instructions so assigned, suffice it to say that we have carefully examined the court's charge and find it to be fair, concise and complete, and to be a correct statement of the law.

The judgment is therefore

Affirmed.

---

[2] Williamson v. Osenton ($35,000), 4 Cir., 1915, 220 F. 653; Mohn v. Tingley ($100,000), 1923, 191 Cal. 470, 217 P. 733; Regenvetter v. Ball ($20,000), 1924, 131 Wash. 155, 229 P. 321; Woodhouse v. Woodhouse ($125,000), 1925, 99 Vt. 91, 130 A. 758; Mulock v. Ulizio ($25,000), 1925, 3 N.J.Misc. 631, 129 A. 204. See 42 C.J.S., Husband and Wife, § 696.

[3] Mulock v. Ulizio, supra, note 2. See 27 Am.Jur., Husband and Wife, § 547; Note, 1930, 69 A.L.R. 1282.