

**Filed**
Supreme Court of Guam, Clerk of Court

# IN THE SUPREME COURT OF GUAM

## IN THE MATTER OF THE ESTATE OF JOAQUIN CRUZ LEON GUERRERO,
Deceased.

Supreme Court Case No. CVA22-012
Superior Court Case No. PR0149-19

## OPINION

### Cite as: 2023 Guam 10

Appeal from the Superior Court of Guam
Argued and submitted on February 24, 2023
Hagåtña, Guam

Appearing for Appellant Elizabeth Raposa
Leon Guerrero:
Jon A. Visosky, *Esq.*
Roberts Fowler & Visosky LLP
865 S. Marine Corps Dr., Ste. 201
Tamuning, GU 96913

Appearing for Appellee Franklin Leon Guerrero:
Joshua D. Walsh, *Esq.*
Razzano Walsh & Torres, P.C.
139 Murray Blvd., Ste. 100
Hagåtña, GU 96910

Appearing for Appellee Patrick Leon Guerrero:
Patrick D. Leon Guerrero, *pro se*
P.O. Box 5223 CHRB
Saipan, MP 96950



**E-Received**
10/11/2023 12:50:03 PM

BEFORE: F. PHILIP CARBULLIDO, Presiding Justice; KATHERINE A. MARAMAN, Associate Justice; and JOHN A. MANGLONA, Justice *Pro Tempore*.

**MARAMAN, J.:**

[1]     Appellant Elizabeth Raposa Leon Guerrero ("Elizabeth") seeks review of the Superior Court's order refusing to recognize her as the legal spouse of Joaquin C. Leon Guerrero ("Joaquin" or the "Decedent"). The probate court concluded that under the laws of Guam, Elizabeth is not recognized as Joaquin's legal spouse, and as such she has no right to appoint an administrator over Joaquin's estate. This conclusion was in error because it misapplied the plain language of Guam's statutes. Guam law requires courts to look to the substantive law of the foreign jurisdiction where a marriage occurred. As applied in this case, the marriage was validly contracted under the law of the Philippines. We reverse and remand for further proceedings.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Joaquin's Divorce and Marriage

[2]     On August 16, 2005, Joaquin petitioned for the dissolution of his marriage to Nancy Toves ("Nancy"). On February 7, 2008, the Superior Court of Guam granted an interlocutory divorce decree. The decree stated, "[T]he marriage of Plaintiff and Defendant is dissolved nunc pro tunc as of January 16, 2008, pending the entry of the final judgment." Record on Appeal ("RA"), tab 91 at 3 (Dec. & Order, Aug. 1, 2022) (quoting DM0473-05 (Interloc. Decree Divorce, Feb. 7, 2008)). That decree also noted the need to address issues surrounding community property and community debts before the issuance of a final judgment of divorce.

[3]     On March 25, 2008, Joaquin signed an affidavit at the U.S. Embassy in the Philippines declaring that his two previous marriages had been legally terminated. On April 10, 2008, Joaquin and Elizabeth obtained a Certificate of Marriage from the Republic of the Philippines. Apparently,

the marriage was solemnized by a ceremony, which was attended by certain members of Joaquin's family. Elizabeth is a national of the Republic of the Philippines who resided in Metro Manila.

[4] On July 2, 2009, the Superior Court issued Findings of Fact and Conclusions of Law which resolved the community property issues between Joaquin and Nancy; it then issued a final judgment of divorce on January 5, 2010. The final judgment of divorce states:

> IT IS ADJUDGED that the parties are granted a Final Judgment of Divorce from each other on the grounds of mutually irreconcilable differences, and the parties hereto are restored to the status of single persons and either of them is permitted to marry after the entry of this Final Judgment of Divorce.

RA, tab 77 at Ex. 5 (Mot. Partial Summ. J., Mar. 3, 2022). The final judgment also states that "the provisions of the Interlocutory Judgment of Divorce are reaffirmed and incorporated in and made a part of this decree." *Id.*

[5] After his marriage to Elizabeth, Joaquin obtained permanent resident status in the Philippines. Joaquin passed away in the Philippines on November 25, 2011.

**B. Probating the Estate**

[6] This probate matter began on September 3, 2019, when Joaquin's son, Appellee Franklin P. Leon Guerrero ("Franklin"), submitted a petition to the Superior Court to Admit Will and for Letters of Administration with Will Annexed. He provided a will that Joaquin purportedly executed in September 2003 (the "2003 Will"). The 2003 Will states that Joaquin is married to Nancy Toves Leon Guerrero; it devises different assets among Nancy, Joaquin's eight living children, other persons, and the Joaquin C. Leon Guerrero Memorial Trust; and it appoints Franklin and Joaquin's daughter, Carlotta, as joint co-executors. While the 2003 Will is notarized, it has

only one witness's attestation, which the probate court noted calls into question this will's validity.[1]

[7] The first hearing on Franklin's petition was held on October 10, 2019, where the court stated it would grant the petition contingent on his filing of certain declarations of service. The next hearing was held on January 9, 2020, where Elizabeth appeared claiming to be Joaquin's spouse and said she would contest the 2003 Will.

[8] Elizabeth nominated Albert I. Tudela as the administrator of Joaquin's estate because she resides in the Philippines. On January 28, 2021, Tudela petitioned the court to admit a will purportedly executed by Joaquin on January 25, 2008 (the "2008 Will"). The 2008 Will says Joaquin is divorced, appoints Franklin as the sole executor, and devises assets among Joaquin's children without mentioning the other beneficiaries listed in the 2003 Will (such as the trust). The 2008 Will has three attesting witnesses. The petition sought to disqualify Franklin from serving as executor because Franklin did not inform the court of the newer will and Joaquin's new spouse (along with "other reasons of improvidence and want of understanding or integrity"). RA, tab 91 at 2 (Dec. & Order).

[9] The probate court set the competing petitions for trial and issued a scheduling order which allowed for discovery and dispositive motions. Appellee Patrick D. Leon Guerrero ("Patrick"), another of Joaquin's sons, and Elizabeth both filed separate motions for summary judgment on the validity of Joaquin and Elizabeth's marriage. On August 1, 2022, the probate court issued a Decision and Order granting the motion of Patrick and denying that of Elizabeth. The court determined:

> Joaquin's divorce from Nancy Toves was not final when he married Elizabeth. The
> Court further determines that Guam law does not recognize Elizabeth as Joaquin's

---

[1] At oral argument, it was conceded that the parties would no longer be attempting to probate the estate using the 2003 Will. Oral Arg. at 10:54:15-10:54:51 (Feb. 24, 2023).

legal spouse. Therefore, Elizabeth lacks the priority to nominate an administrator for Joaquin's estate and this matter shall proceed to trial on the petition filed by Joaquin's son and appointed executor, Franklin P. Leon Guerrero.

*Id.* at 1.

[10]     The court rejected Elizabeth's argument that Patrick lacked standing to challenge the validity of the marriage because the case was "not an action to invalidate a marriage but rather a probate matter to determine the decedent's rightful heirs," and that it was not "'prohibiting' Joaquin and Elizabeth's marriage; instead, it [was] analyz[ing] whether Joaquin's non-final divorce deprives Elizabeth of inheritance rights or priority under probate law." *Id.* at 4, 10-11. The court determined:

> The Court's probate jurisdiction encompasses determining the proof of wills and letters testamentary, as well as letters of administration and the administration of estates. 15 GCA § 1403. In exercising its jurisdiction, the Court must examine questions of competency and inheritance. As an undisputed heir of Joaquin, Patrick has the right to ask the Court to determine other persons' interests in the estate. Moreover, the will contest statute gives Patrick the right as a person interested in Joaquin's will to state his position on the validity of proffered wills during a will contest. 15 GCA § 1601. For these reasons, the Court has subject matter jurisdiction over this will contest and the issues raised herein, and Patrick's participation does not eliminate such jurisdiction.

*Id.* at 4. The court also rejected the argument that Patrick's challenge to the marriage was barred by the doctrine of laches.

[11]     The probate court further rejected Elizabeth's argument that "the language that the marriage was dissolved 'nunc pro tunc' and 'pending the entry of the final judgment' means that once the final judgment was entered, it became retroactive to the date of the interlocutory decree." *Id.* at 6. The court cited 19 GCA §§ 8321, 8322, and 8201(b) to support its conclusion that "the issuance of an interlocutory judgment declares one's *entitlement* to a divorce. . . . Then, after six months, a final judgment may be entered . . . . The final judgment is what officially dissolves the marriage." *Id.* The probate court then further stated:

> When the court executed the interlocutory decree, it could not make the final judgment retroactive. Indeed, it could not be finalized for six months, at the least. Also, based on the above statutory provisions, the final judgment is separate and apart from the interlocutory decree and was not to be incorporated into it.

*Id.* at 6-7.

[12]     The court further concluded that even if a final divorce decree could be made retroactive to the date of the interlocutory decree, it did not find the final judgment to have this effect:

> [T]his Court does not interpret the final divorce decree to be retroactive to the date of the interlocutory decree. When plainly read, the "nunc pro tunc" language, which is commonly known to make an order retroactive to a certain date, references the date of the hearing on the interlocutory decree rather than making the final judgment retroactive. The hearing on the interlocutory decree occurred on January 16, 2008, and the Interlocutory Decree was filed three weeks later. Because the Court ordered the dissolution of the marriage "nunc pro tunc as of January 16, 2008," all that was made retroactive was the effective date of the February 7, 2008 Interlocutory Decree to the date of the hearing. The "nunc pro tunc" language had no relevance to the effective date of the final judgment.

*Id.* at 7. The court thus concluded that "Joaquin's divorce from Nancy was not final when he married Elizabeth in 2009." *Id.*

[13]     The court also rejected Elizabeth's argument that 19 GCA § 3107 validated her foreign marriage to Joaquin because it was valid under the law of the Philippines. The court found that "[s]ection 3107 recognizes Elizabeth and Joaquin's marriage in Guam," but "under section 3105, Joaquin and Elizabeth's marriage would be illegal, void, and not valid in Guam 'from the beginning' because one year had not elapsed from the date of his interlocutory divorce decree and because his marriage to Nancy had not yet been dissolved." *Id.* at 8 (citing 19 GCA § 3107 (2005) ("All marriages contracted outside of the Territory of Guam, which would be valid by the laws of the country in which the same were contracted, are valid in the territory of Guam."); 19 GCA § 3105(a) ("In no case can a marriage of either of the parties during the life of the other, be valid in Guam, if contracted within one (1) year after the entry of an interlocutory decree in a proceeding

for divorce.")).  The court construed these statutes to conflict as applied to this case, and resolved the conflict by stating:

> One way to harmonize the language of both statutes is to recognize that a foreign marriage is valid under section 3107 as long as it still falls within the parameters of section 3105.  In other words, a marriage initiated outside Guam can be recognized as valid in Guam if valid in the foreign jurisdiction, and also does not occur within the one year of the entry of an interlocutory decree.

*Id.*  In applying this standard, the court reasoned:

> Under Guam law, as of April 2008, Joaquin was still considered married to Nancy and was still within the one-year timeframe in which he could not have entered into a valid marriage.  This Court is bound to enforce Guam law on this issue, meaning that Joaquin's marriage within three months of his interlocutory divorce cannot be recognized as valid.

*Id.* at 9.

[14]    The probate court determined that Elizabeth did not have priority to select an administrator under the probate law because she was not Joaquin's surviving spouse.  Despite this lack of priority, the court stated it would still permit Elizabeth to present evidence at a future hearing regarding which will should be admitted, Franklin's capacity to serve as administrator, and what inheritance rights she may have as a putative spouse.

[15]    Elizabeth timely filed this appeal and asks the court to overturn the decision of the probate court that her marriage is invalid.

## II.  JURISDICTION

[16]    This court has jurisdiction over orders made appealable under the Probate Code.  7 GCA § 25102(k) (2005); 15 GCA § 3433 (2005).  Elizabeth has also alleged that the heirs lack standing to challenge the validity of her marriage, which implicates the jurisdiction of this court because "[w]hen a party lacks standing, this court is without subject matter jurisdiction."  *Guam Mem'l Hosp. Auth. v. Superior Court*, 2012 Guam 17 ¶ 8 (citing *Benavente v. Taitano*, 2006 Guam 15 ¶

14). Standing is a threshold jurisdictional issue that can be raised at any stage of the proceedings, including for the first time on appeal. *Id.*

## III. STANDARD OF REVIEW

[17]    "Questions of statutory interpretation and jurisdiction are reviewed *de novo.*" *DFS Guam L.P. v. A.B. Won Pat Int'l Airport Auth.*, 2020 Guam 20 ¶ 37. "We review a trial court's decision granting a motion for summary judgment *de novo.*" *Ngirangesil v. Kim*, 2021 Guam 28 ¶ 8 (quoting *Unpingco v. Derry*, 2021 Guam 1 ¶ 9). Where the material facts are undisputed and application of Guam and Philippine law to the facts presents pure questions of law, this court reviews the matter *de novo*. *See In re Marriage of Elali & Marchoud*, 294 Cal. Rptr. 3d 804, 811 (Ct. App. 2022).

## IV. ANALYSIS

### A. Jurisdiction and Standing

#### 1. The heirs have standing to contest wills and raise related issues

[18]    Elizabeth has alleged that the Superior Court, sitting in probate, exceeded its limited jurisdiction when it invalidated a foreign marriage. Appellant's Br. at 30 (Nov. 21, 2022) (citing *Zahnen v. Limtiaco*, 2008 Guam 5 ¶ 11). As the Guam Legislature enacted a probate code substantially similar to the California Probate Code in 1953, we look to California case law for interpretation. *Zahnen*, 2008 Guam 5 ¶ 17 (citing *People v. Angoco*, 2007 Guam 1 ¶ 52 n.4). The probate code states that "any time before the hearing of a petition for probate and for the grant of . . . letters of administration with the will annexed in the first instance, *any* person interested may contest the will by filing written grounds of opposition to the probate thereof." 15 GCA § 1601 (2005) (emphasis added). The probate jurisdiction of the Superior Court is delineated in 15 GCA § 1403: "Wills must be proved, and letters testamentary, letters of administration with the will

annexed, letters of administration or special letters of administration granted, and administration of estates of decedents had, in the Superior Court of Guam." California courts have held:

> "The probate court, while sitting in matters of probate, is a court of general jurisdiction, and in determining any questions arising in the administration of an estate, which it is authorized to decide may bring to its aid 'the full equitable and legal powers with which, as a superior court, it is invested.'"

*In re Auslender's Estate*, 349 P.2d 537, 542 (Cal. 1960) (in bank) (quoting *In re Cornaz' Estate*, 65 P.2d 784, 790 (Cal. 1937)).

[19]     As the Superior Court was sitting in a matter of probate it could decide—proving a will and granting letters of administration with the will annexed—it was a court of general jurisdiction which could bring to its aid the full equitable and legal powers with which it is invested and could determine questions arising in the administration of the estate. *Id.* Because the question of Joaquin's marriage to Elizabeth arose in the administration of the estate, the Superior Court sitting in probate had jurisdiction to adjudicate the marriage's validity.

[20]     Elizabeth quotes at length from our prior decisions discussing the doctrine of standing to support her contention that "[n]either Patrick nor any other heir has [Article III] standing to challenge Joaquin's and Elizabeth's 2008 marriage." Appellant's Br. at 10-11 (quoting *Barrett-Anderson v. Camacho*, 2015 Guam 20; *Benavente*, 2006 Guam 15; *People v. Tennessen*, 2011 Guam 2). But this is not how Article III standing works. "The purpose of the standing requirement is to ensure that the *plaintiff* has a concrete dispute with the defendant." *Guam Tai-Pan Dev. & Constr., Inc. v. Yigo Alta Ests., Inc.*, 2002 Guam 20 ¶ 17 (quoting *Hall v. Norton*, 266 F.3d 969, 976-77 (9th Cir. 2001)). Elizabeth's standing argument is fundamentally flawed because it confuses a party's power to bring their own claim with the power to defend against someone else's. *See id.* Elizabeth's argument conflates the ability to bring a claim with the ability to defend against

one.  Elizabeth does not, and cannot, argue that Franklin and Patrick lack standing as parties to the probating of their father's estate.

[21]    Legitimate children who are named beneficiaries in a decedent's will have standing to probate that will and contest other wills.  *See* 15 GCA § 1601.  It is undisputed that Franklin had standing to petition to admit the 2003 Will.  And Elizabeth can hardly disclaim the existence of a "concrete dispute" with the heirs when she brought her own petition.  *See Guam Tai-Pan*, 2002 Guam 20 ¶ 17.  Nor does she dispute that both Franklin and Patrick generally had standing to contest the 2008 Will.  She merely claims that although the heirs have standing to participate in the will contest, they lack standing to raise a certain defense to her petition.  This is simply not the law; even if the heirs were precluded from suing to annul their father's marriage, they can still defend against Elizabeth's claim of priority on the merits.  *See id.* (quoting *Parker v. McQuade Plumbing & Heating, Inc.*, 335 N.W.2d 7, 8 (Mich. Ct. App. 1983) (per curiam)).  Franklin and Patrick have standing to participate in the will contest, and it was proper for the Superior Court to reach the merits of Patrick's summary judgment motion.

### 2.  Since the marriage may be collaterally attacked under Philippine law, the heirs have standing to make such a claim in Guam courts

[22]    "When a requirement goes to subject matter jurisdiction, courts are obligated to consider *sua sponte* issues that the parties . . . have not presented."  *Teleguam Holdings LLC v. Guam*, 2018 Guam 5 ¶ 19 (alteration in original) (quoting *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012)).  Even in jurisdictions that have adopted the Uniform Probate Code and its general grant of standing to interested parties, standing to collaterally attack a marriage after the death of a party to the marriage is narrower and governed by family law principles.  *See, e.g.*, *In re Marriage of Adams*, 604 P.2d 332, 334 (Mont. 1979) (stating that under Title 40 of the Montana Code, which governs Family Law, a challenge to a prohibited marriage must be brought before death), *abrogated on other*

*grounds by Dagel v. City of Great Falls*, 819 P.2d 186 (Mont. 1991); *see also In re A.B. Won Pat Int'l Airport Auth.*, 2019 Guam 6 ¶ 20 (observing that meeting statutory requirements does not "automatically satisf[y]" standing requirements). Thus, we must determine if Patrick and Franklin fall into the limited class of people that have standing to challenge Joaquin's marriage after his death under Guam family law principles.

[23] At common law, whether a third party had standing to challenge a marriage after death turned on if the marriage was classified as void or voidable. *See, e.g.*, *In re Romano's Estate*, 246 P.2d 501, 505 (Wash. 1952). Traditionally, a voidable marriage could be annulled only during the life of the parties to the marriage, while a void marriage could be so declared in any collateral proceeding. *See, e.g.*, *In re Estate of Laubenheimer*, 2013 WI 76, ¶ 84, 350 Wis. 2d 182, 833 N.W.2d 735. Under the void/voidable dichotomy:

> When a marriage is wholly void, no civil rights are secured, thereby, it is subject to both direct and collateral attack, by anyone, at any time in any court or any proceeding in which the fact of the marriage is material. A void marriage may be attacked after the death of either or both of the parties, and its invalidity need not be established by a judicial decree.

55 C.J.S. *Marriage* § 51 (August 2023 Update) (internal footnotes omitted). California courts, in interpreting the Civil Code on which Guam's marriage laws were initially modeled, stated:

> In view of the language of this enactment, declaring certain marriages to be 'illegal and void from the beginning,' it cannot be doubted that a marriage prohibited by the terms of the section is a nullity, open to attack collaterally by any one interested, and not merely voidable . . . .

*In re Elliott's Estate*, 132 P. 439, 440-41 (Cal. 1913), *overruled on other grounds by Spellens v. Spellens*, 317 P.2d 613 (Cal. 1957) (in bank).

[24] Courts have long recognized the harshness of the traditional rule. *See, e.g.*, *Tegenborg v. Tegenborg*, 98 A.2d 105, 106 (N.J. Super. Ct. App. Div. 1953). Cognizant of the modern trend to

disallow, or severely limit, collateral attacks on marriages after death,[2] we limit our determination of Franklin and Patrick's standing to collaterally attack their father's foreign marriage over a decade after his death to the unique facts of this case. *Cf. Ueda v. Bank of Guam*, 2005 Guam 23 ¶ 23 n.13 (limiting the holding to the specific facts before the court). Absent strong public policy concerns to the contrary, we will look to the law of the foreign jurisdiction where the marriage was contracted to determine if it is susceptible to collateral attack after death.

[25] Here, the Republic of the Philippines has the most significant relationship to the marriage between Joaquin and Elizabeth. Under the law of the Philippines, "[t]he validity of a void marriage may be collaterally attacked." *De Castro v. Assidao-De Castro*, 568 Phil. 724, 731 (2008),

---

[2] The Uniform Marriage and Divorce Act ("UMDA"), which has been adopted in a minority of states, recommends that collateral attacks on marriage be prohibited after death. Unif. Marriage & Divorce Act § 208 (amended 1973). According to the drafters:

> The underlying policy reasons for this principle are clear: the traditional "void marriage" doctrine often imposed unwise and unfair penalties on innocent "spouses" in stable family situations long after the questioned marriage had occurred. The penalties serve no effective deterrent purpose, but cause severe economic dislocations; a spouse may be denied workmen's compensation and social security benefits, or even a share in a spouse's estate, after the marriage has been terminated by the death of the other spouse, despite the fact that the surviving spouse had no reason to suspect the invalidity of the marriage.

*Id.* cmt. Indeed, historic applications of the traditional rule have sometimes gone beyond "unwise and unfair" penalties to the unjust. *See, e.g.*, *In re Monks' Estate*, 120 P.2d 167, 171-73, 177 (Cal. Dist. Ct. App. 1941) (allowing spouse of deceased's "boyhood friend" to collaterally attack in probate a marriage as void under Arizona anti-miscegenation laws based on testimony that wife "was at least one-eighth Negroid"); *In re Shun T. Takahashi's Estate*, 129 P.2d 217, 222 (Mont. 1942) (allowing collateral attack in probate by public administrator on marriage of 26 years between Japanese man and white woman because it was utterly null and void under Montana anti-miscegenation laws). More recent applications of the traditional rule have also led to courts permitting collateral attacks that could alternatively be described as unwise, unfair, or unjust. *See, e.g.*, *In re Estate of Araguz*, 443 S.W.3d 233, 237 (Tex. App. 2014) (allowing mother and ex-wife of volunteer firefighter who died in line of duty to launch collateral attacks on a marriage because surviving spouse had undergone a "sex change"); *Lockyer v. City & Cnty. of San Francisco*, 95 P.3d 459, 510 (Cal. 2004) (allowing collateral attacks on same-sex marriages to have binding effect on nonparties to the action). Even in jurisdictions that have not adopted the UMDA, such as California, the traditional rule has been circumscribed to more accurately reflect reality, which leads to more just and predictable results. *See In re Marriage of Seaton*, 133 Cal. Rptr. 3d 50, 57 (Ct. App. 2011) ("[T]he idea that a void marriage never existed is a legal fiction that should be used only where it promotes substantial justice between the parties to the void marriage, and not where the rights of third parties are involved.").

To resolve the merits of this appeal, it is not necessary to determine whether Guam applies the harsh traditional rule or if the statutory scheme supports adoption of the minority rule that a "bigamous" marriage is not subject to collateral attack after the impediment to a valid marriage is removed. *See Smith v. Smith*, 190 N.W.2d 174, 176-78 (Wis. 1971). This is a question we reserve for a future case.

https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/44838 (citation omitted). The heirs have standing because they allege the marriage is void for bigamy, and an allegedly void marriage may be attacked under the law of the Philippines.

[26]     We reject the other jurisdictional arguments raised by the parties because we are satisfied that the probate court's order determined Elizabeth's heirship. An order determining priority of persons entitled to letters of administration is an order determining heirship. *See In re Edgett's Estate*, 10 Cal. Rptr. 552, 553 (Dist. Ct. App. 1961); *In re Hirschberg's Estate*, 36 Cal. Rptr. 661, 668 (Dist. Ct. App. 1964). An order that determines a decedent's surviving spouse adjudicates a person's heirship claim. *See In re Estate of Loveless*, 64 S.W.3d 564, 570 (Tex. App. 2001). As the order determined Elizabeth's priority and determined she was not a surviving spouse, the order was one determining heirship and is appealable under the Probate Code. *See* 7 GCA § 25102(k); 15 GCA § 3433.

**B.  Conflict of Laws**

> **1.  The plain language of 19 GCA § 3107, The Restatement (Second) of Conflict of Laws, and persuasive California authority all indicate the substantive law of the Philippines should be applied**

[27]     "In cases involving statutory construction, the plain language of a statute must be the starting point." *People v. Rachulap*, 2022 Guam 9 ¶ 18 (quoting *Pangelinan v. Gutierrez*, 2000 Guam 11 ¶ 23). The plain language of Guam's foreign marriage statute states that a court should apply the law of the jurisdiction where the marriage was contracted: "All marriages contracted outside of the territory of Guam, which would be valid by the laws of the country in which the same were contracted, are valid in the territory of Guam." 19 GCA § 3107. This section was adopted nearly verbatim from the Civil Code of California, and California courts have reliably applied the law of the jurisdiction where the marriage occurred to determine its validity. *E.g.*,

*Pearson v. Pearson*, 51 Cal. 120, 124-25 (1875); *In re Gosnell's Estate*, 146 P.2d 42, 43 (Cal. Dist. Ct. App. 1944); *In re J.S.*, 132 Cal. Rptr. 3d 244, 247-48 (Ct. App. 2011).

[28]     Under the Restatement (Second) of Conflict of Laws approach, "[t]he validity of a marriage will be determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the spouses and the marriage."  Restatement (Second) of Conflict of Laws § 283(1) (Am. L. Inst. 1971); *see also Stahl v. Stahl*, 2013 Guam 26 ¶ 21 (citing with approval the Restatement (Second) of Conflict of Laws).  The jurisdiction with the most significant relationship to the parties at the time of marriage was the Philippines because the marriage was contracted in the Philippines under Philippine law, Elizabeth is a Philippine citizen, and the couple cohabited in the Philippines until Joaquin's death.  *Cf. Islam v. Islam*, 2009 MP 17 ¶ 25 (finding Philippine law controlling in a marriage with similar facts).  Thus, the probate court erred when it did not engage with the law of the Philippines.

### 2.  As the Philippines does not allow divorce, its courts would look to the law of Guam to determine whether the marriage was void

[29]     The Philippine law governing marriages is in Title I of the Family Code of the Philippines. Office of the President, The Family Code of the Philippines, Exec. Order No. 209, s. 1987, as amended (July 6, 1987), https://www.officialgazette.gov.ph/1987/07/06/executive-order-no-209-s-1987; *see also Islam*, 2009 MP 17 ¶ 13 n.5.  Philippine law does not provide for absolute divorce, and its courts cannot grant it, but a divorce obtained abroad may be recognized in the Philippines if the decree conforms to the foreign law allowing it.  *Garcia v. Recio*, 418 Phil. 723 (2001), https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/52783.  The Supreme Court of the Philippines has held that where a party presents a foreign interlocutory divorce decree as evidence that the capacity to remarry has been restored, the legal effects of the interlocutory decree under the foreign law must be shown.  *Id.*  A subsequent remarriage will be valid only if the interlocutory

decree has the legal effect of an absolute divorce that terminates the marriage. *Id.* If it "did not absolutely establish his legal capacity to remarry according to his national law," the subsequent marriage is void. *Id.* Under the substantive law of the Philippines, Joaquin must have had the legal capacity to remarry according to his national law, which can be shown by the legal effect of the interlocutory divorce decree under the laws of Guam.

## C. Legal Effect of a Guam Interlocutory Divorce Decree

### 1. In Guam, there is no six-month waiting period between an interlocutory decree and entry of final judgment

[30] The probate court erred in interpreting 19 GCA § 8322 to require a six-month waiting period between entry of an interlocutory and final decree of divorce. Title 19 GCA § 8322 requires a six-month waiting period only between the *filing for divorce* and entry of final judgment.

[31] Although this statute was originally based on California Civil Code section 132, it has since been amended several times. *Compare* Cal. Civ. Code § 132 (1949) ("When one year has expired after the entry of such interlocutory judgment, the court . . . may enter the final judgment . . . ."), *and* Guam Civ. Code § 132 (1976) ("When six (6) months have expired after the entry of such interlocutory judgment, the court . . . may enter the final judgment . . . ."), *with* Guam Civ. Code § 132 (1984) ("When six (6) months have expired after *filing* of the initial petition or complaint for divorce, and following entry of an interlocutory decree of divorce, the court . . . may enter the final judgment . . . ." (emphasis added)). Guam has followed California in amending the law to eliminate the waiting period between interlocutory and final decrees. *In re Marriage of Frapwell*, 125 Cal. Rptr. 878, 880-81 (Ct. App. 1975) ("[I]n 1965, the one-year waiting period was made to run from the date of service of the summons and complaint, so that . . . often a final decree of dissolution can be entered concurrently with the entry of the interlocutory decree." (internal citation omitted)).

**[32]**    Although marriages contracted between entry of an interlocutory decree and expiration of the interlocutory period are generally void, *see* 27A C.J.S. *Divorce* § 352 (Aug. 2023 Update), Guam no longer has such a period.[3]  Franklin's reliance on *Sullivan v. Sullivan*, 28 P.2d 914 (Cal. 1934) (in bank), is misplaced because that "body of law," Appellee's Br. at 6, interpreted language that was removed from Guam's statute nearly 40 years ago.  Any argument that Joaquin and Elizabeth's marriage was void because Joaquin's prior marriage to Nancy could not have been dissolved for another six months is wrong as a matter of law.  The amended petition for divorce was filed on August 16, 2005, and the interlocutory decree of divorce that ended Joaquin's marriage to Nancy was entered on February 7, 2008.  The final judgment could have been entered immediately.

### 2.  In Guam, the entry of a final judgment of divorce is a ministerial formality

**[33]**    In Guam, a final decree of dissolution can often be entered concurrently with the entry of the interlocutory decree. *See In re Marriage of Frapwell*, 125 Cal. Rptr. at 880-81.  This court has yet to consider the legal status of parties in the rare case where an interlocutory decree purports to dissolve their marriage relationship, but issuance of a final judgment is postponed until other issues are resolved.

**[34]**    In 1995, the Appellate Division of the District Court of Guam considered a related issue in *McGann v. McGann*, No. CV94-00071A, 1995 WL 604415 (D. Guam App. Div. Sept. 13, 1995).

---

[3] Prior practice further supports this conclusion.  In the past two decades, this court has decided over a dozen divorce cases where interlocutory and final decrees were entered simultaneously, as a single document, or in quick succession: *Kim v. Min Sun Cha*, 2020 Guam 22 ¶ 5; *Hemlani v. Hemlani*, 2015 Guam 34 ¶ 3; *Ptack v. Ptack*, 2015 Guam 5 ¶ 21; *Paguio v. Paguio*, 2014 Guam 36 ¶ 9; *Marriott v. Marriott*, 2014 Guam 28 ¶ 4; *Kloppenburg v. Kloppenburg*, 2014 Guam 5 ¶ 14; *Davis v. Davis*, 2014 Guam 4 ¶ 10; *Scroggs v. Scroggs*, 2014 Guam 2 ¶ 6; *Lujan v. Lujan*, 2012 Guam 7 ¶ 11; *Babauta v. Babauta*, 2011 Guam 15 ¶ 15; *Blas v. Cruz*, 2009 Guam 12 ¶ 8; *Hart v. Hart*, 2008 Guam 11 ¶ 2; *Rojas v. Rojas*, 2007 Guam 13 ¶ 4; *Pineda v. Pineda*, 2005 Guam 10 ¶ 2; *Leon Guerrero v. Moylan*, 2002 Guam 18 ¶ 23; *Navarro v. Navarro*, 2000 Guam 31 ¶ 3, *abrogated on other grounds by Sinlao v. Sinlao*, 2005 Guam 24; *Gray v. Superior Court*, 1999 Guam 26 ¶ 3.  No error has been ascribed to this practice, nor do we do so now.

The court determined that where a party seeks to appeal the Superior Court's grant of divorce, "[i]t is the interlocutory decree from which an appeal must be sought. It is at *that stage* that the parties' rights and liabilities are fully established and from which appeal must be taken." *Id.* at *2 (emphasis added). In dismissing the appeal in that case as untimely, the court stated, "The entering of the final decree of divorce is merely a ministerial formality performed by the court . . . . [I]t is the interlocutory decree that determines the rights and liabilities of the parties . . . ." *Id.*

[35]    "Generally, when a legislature adopts a statute that is identical or similar to one in effect in another jurisdiction, it is presumed that the adopting jurisdiction applies the construction placed on the statute by the originating jurisdiction." *Sumitomo Constr. Co. v. Zhong Ye, Inc.*, 1997 Guam 8 ¶ 7. When no legislative history can be found on the policy considerations underlying the adopting jurisdiction's enactment of a borrowed statute, it is appropriate to look to the legislative policy of the originating jurisdiction. *Terex Corp. v. S. Track & Pump, Inc.*, 117 A.3d 537, 544 n.24 (Del. 2015); *see also Clayworth v. Pfizer, Inc.*, 233 P.3d 1066, 1080 (Cal. 2010) ("[Courts] may presume that when the Legislature borrows a federal statute and enacts it into state law, it has considered and is aware of the legislative history behind that enactment."); *Com. Bank v. McGowen*, 956 N.W.2d 128, 133 (Iowa 2021) ("When an Iowa statute is borrowed from similar federal legislation, we 'presume our legislature intended what Congress intended.'" (quoting *City of Davenport v. Pub. Emp. Rels. Bd.*, 264 N.W.2d 307, 313 (Iowa 1978) (en banc))); *Davis Mem'l Hosp. v. W. Va. State Tax Comm'r*, 671 S.E.2d 682, 693 (W. Va. 2008) ("[W]here *material and substantive changes* are made by the Legislature in adopting a federal statute the presumption that the Legislature intended to accomplish the same purposes and objectives as the Congress is no longer valid." (quoting *State v. Wells*, 276 N.W.2d 679, 691 (N.D. 1979))).

[36]    The legislative policy of California in amending the waiting period to six months after service of process was "permitting the prompt severance of a marriage relationship which had proved unworkable." *In re Marriage of Fink*, 126 Cal. Rptr. 626, 630 (Ct. App. 1976). This was also the legislative policy of Guam when it amended the waiting period to begin with the filing of the complaint. For nearly 40 years, it has been *I Liheslaturan Guåhan*'s strong legislative policy preference to facilitate prompt severance of unworkable marriages: in the same bill that amended the waiting period, it also allowed for the dissolution of any marriage where one party was physically present in Guam.[4] Guam Pub. L. 17-081:26-29 (1984). That the current six-month waiting period may be shortened by the trial court upon the motion of either party and a showing of cause further strengthens our conclusion. *See* 19 GCA § 8322.

[37]    We find the reasoning of *McGann* to be highly persuasive, and given Guam's policy favoring prompt severance of a marriage relationship which has proven unworkable, we hold that the legal effect of a Guam interlocutory divorce decree dissolving a marriage is to establish the parties' rights as single persons. Despite section 8322's statement that "final judgment shall restore the parties to status as single persons," the entry of a final judgment is a ministerial formality; in the circumstances such as this case where the interlocutory and final decrees are not filed simultaneously, Guam does not consider the parties to be married in the interim.[5]

---

[4] Although the Superior Court later held this residency provision to be inorganic, *see* 19 GCA § 8318 cmt., subsection (b) retains the provision adopted in Guam Public Law 17-081 that one party need only reside in Guam for a week if both parties consent in writing to the dissolution. When P.L. 17-081 is read as a whole, it shows a clear legislative policy shift towards prompt dissolution of unworkable marriages. *See Gov't of Guam v. 162.40 Square Meters of Land*, 2011 Guam 17 ¶ 27 (per curiam) ("[I]n determining legislative intent, a statute must be read as a whole, as well as to its objects and policy." (citing *Sumitomo Constr., Co. v. Gov't of Guam*, 2001 Guam 23 ¶ 17)). This policy trend is further highlighted by passage of 19 GCA § 8219 in 1998, which recognized irreconcilable differences as a ground for divorce. *See* Guam Pub. L. 24-134:4 (Feb. 16, 1998).

[5] The fact that the final judgment of divorce in this case recited this statutory language does not change our analysis. *See* RA, tab 77 at Ex. 5 (Mot. Partial Summ. J., Mar. 3, 2022).

### 3. *Nunc pro tunc* language granting divorce retroactive to the date of an interlocutory divorce decree is permissible

[38]     As a final judgment of divorce is a ministerial act, it can be entered *nunc pro tunc*.[6]  *In re Avery*, 445 N.Y.S.2d 672, 676-77 (N.Y. Surr. Ct. 1981).  This court has stated, "'*Nunc pro tunc*' is a Latin expression meaning 'now for then.'  A court ruling '*nunc pro tunc*' applies retroactively to correct an earlier ruling."  *People v. Tennessen*, 2010 Guam 12 ¶ 5 n.4 (per curiam).

[39]     Under section 133 of the California Civil Code, courts were explicitly allowed to enter final judgments of divorce *nunc pro tunc*, with courts holding that the purpose of the statute was "obviously to 'validate otherwise void marriages and thus relieve the parties to such marriages from the stigma and other consequences of bigamous relationships into which they might innocently fall by reason of oversight or neglect to have a final decree entered.'"  *In re Estate of Casimir*, 97 Cal. Rptr. 623, 628 (Ct. App. 1971) (citation omitted).  But before the waiting period was amended in 1965, California courts were barred from entering final judgments *nunc pro nunc* that would retroactively shorten the statutory waiting period between interlocutory and final divorce decrees.  *See Ringel v. Superior Ct. of Alameda Cnty.*, 128 P.2d 558, 560 (Cal. Dist. Ct. App. 1942) (holding plaintiff had right to final decree of divorce *nunc pro tunc* only after expiration of one-year interlocutory waiting period).  As explained in a leading source:

> In some jurisdictions divorce decrees are interlocutory when they are entered and *do not become final until after the expiration of a stated period of time*. . . .
>
> During the period after an interlocutory decree is entered and before a final decree is entered, the parties are still considered to be married.  The trial court

---

[6] Prior practice also supports *nunc pro tunc* entry of a divorce judgment.  *See Navarro*, 2000 Guam 31 ¶ 3 ("On June 14, 1999, the trial court filed both an Interlocutory Judgment of Divorce and a Final Judgment of Divorce *nunc pro tunc* to June 1, 1999."), *abrogated on other grounds by Sinlao*, 2005 Guam 24; *Cruz v. Cruz*, 2005 Guam 3 ¶ 3 ("Michael and Susan were divorced in the Superior Court of Guam on May 23, 2003 *nunc pro tunc* to March 18, 2003."); *cf. Ambas v. Vinluan*, No. 810005A, 1982 WL 30774, at *2 (D. Guam App. Div. Sept. 29, 1982) ("[T]he judgment of the Superior Court is reversed, with directions to enter judgment annulling the marriage nunc pro tunc as of the date of said Superior Court hearing.").

> cannot employ a *nunc pro tunc* order to avoid this rule by shortening the waiting period retroactively.

24 Am. Jur. 2d *Divorce and Separation* § 374 (emphasis added) (internal footnotes omitted); *see also Estate of Ladd v. Estate of Ladd*, 640 A.2d 29, 31 (Vt. 1994) ("Although a nunc pro tunc order may be used to change the date of the decree nisi from the date it was entered to the date it was announced or issued by the court, it may not be used to shorten the statutory waiting period retroactively.").

[40]     Many jurisdictions have held that courts have the inherent power, in a proper case, to enter a judgment of divorce *nunc pro tunc*. C.P. Jhong, Annotation, *Entering judgment or decree of divorce nunc pro tunc*, 19 A.L.R.3d 648 § 4A (1968) (citing decisions from Arizona, California, Florida, Illinois, Iowa, Massachusetts, Mississippi, New Hampshire, New York, Ohio, Tennessee, Texas, and Washington). Although the Guam Legislature did not adopt section 133 of the California Civil Code, it has authorized the entry of final divorce decrees *nunc pro tunc* in the case of death. 19 GCA § 8322 ("If either party dies after entry of an interlocutory divorce, but before entry of the final decree of divorce, the Court shall enter a final decree of divorce, effective nunc pro tunc to the date of entry of the interlocutory decree of divorce."). We find this is an expansion of the court's inherent powers because allowing a retroactive decree after death is in derogation of the common law. *See, e.g.*, *Sahler v. Sahler*, 17 So. 2d 105, 107 (Fla. 1944) ("[T]he weight of authority in this country relative to the authority of Courts to enter 'Nunc pro Tunc' decrees in divorce suits is to the effect that a 'Nunc pro Tunc' decree cannot be entered where one of the parties to a divorce dies before the rendition of a Decree."); *see also* 19 A.L.R.3d 648 § 7; *Pangelinan v. Camacho*, 2008 Guam 4 ¶ 5 n.9 ("The general rule is that statutes do not supplant the common law unless it appears that the Legislature intended to cover the entire subject . . . ." (quoting *I.E. Assocs. v. Safeco Title Ins. Co.*, 702 P.2d 596, 598 (Cal. 1985))).

**[41]**    A final judgment of divorce can be made retroactive to the date the party legally had the right to have it entered.  *In re Marriage of Mallory*, 64 Cal. Rptr. 2d 667, 676 (Ct. App. 1997).  Absent a statutory waiting period, that date can be the same day as the interlocutory decree of divorce if—as in this case—more than six months have passed since the petition had been filed.

### 4.    The final judgment had retroactive effect

**[42]**    The interlocutory divorce decree states: "NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED: That the marriage of Plaintiff and Defendant is dissolved nunc pro tunc as of January 16, 2008, pending the entry of the final judgment."  RA, tab 16 (Obj. to Pet., Mar. 17, 2021) at Ex. A (Interloc. Decree Divorce, Feb. 7, 2008).  The final judgment of divorce states: "IT IS FURTHER ADJUDGED AND ORDERED that the provisions of the Interlocutory Judgment of Divorce are reaffirmed and incorporated in and made a part of this decree."  *Id.* at Ex. B (Final J. Divorce, Jan. 5, 2010).

**[43]**    We find the language of the decrees to be unambiguous.  The final judgment incorporated and reaffirmed the interlocutory decree, which dissolved the marriage *nunc pro tunc* as of January 16, 2008.  Where a subsequent marriage occurs between an interlocutory divorce decree and a final decree entered *nunc pro tunc*, we "hold that the nunc pro tunc decree adjudicated that the parties were restored to their status as single persons upon the nunc pro tunc date of the final decree and were capable of contracting a valid marriage thereafter."  *Cahoon v. Pelton*, 342 P.2d 94, 97 (Utah 1959) (citing *Shippee v. Shippee*, 66 A.2d 77 (N.H. 1949); *Bannister v. Bannister*, 29 A.2d 287 (Md. 1942); *In re Kelley's Estate*, 310 P.2d 328 (Or. 1957)), *overruled on other grounds by*

*Norton v. Macfarlane*, 818 P.2d 8 (Utah 1991). The final judgment had the retroactive effect of dissolving the marriage and capacitating Joaquin to remarry on January 16, 2008.[7]

## D. The Prohibition on Remarriage in 19 GCA § 3105

[44]     A final barrier to Joaquin and Elizabeth's marriage is 19 GCA § 3105. Although we have doubts about whether that section remains in force generally, we find it does not affect the outcome in this case.

### 1. 19 GCA § 3105 may have been repealed by implication

[45]     When interpreting a statute, we begin with its plain language because our "task is to determine whether or not the statutory language is 'plain and unambiguous.'" *In re Guardianship of Moylan*, 2021 Guam 15 ¶ 36 (citation omitted). As we articulated in *In re Guardianship of Moylan*:

> "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." "[I]n expounding [on] a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy."

2021 Guam 15 ¶ 36 (alterations in original) (first quoting *Aguon v. Gutierrez*, 2002 Guam 14 ¶ 6; and then quoting *Sumitomo Constr., Co. v. Gov't of Guam*, 2001 Guam 23 ¶ 17). A statute is ambiguous if, after this analysis, "its terms remain susceptible to two or more reasonable interpretations." *Halversen v. Allstate Prop. & Cas. Ins. Co.*, 2021 UT App 59, ¶ 9, 493 P.3d 693 (citation omitted); *see also Guido v. Mount Lemmon Fire Dist.*, 859 F.3d 1168, 1173 (9th Cir. 2017) ("A statute must be 'susceptible to more than one reasonable interpretation' to be ambiguous." (citation omitted)), *aff'd*, 139 S. Ct. 22 (2018). When a statute is ambiguous, courts

---

[7] The language in the final judgment of divorce stating that "either of them is permitted to marry after the entry of this Final Judgment of Divorce," RA, tab 77 (Mot. Partial Summary J. (Ex. 5)), does not impact the above analysis on the operation of Guam's divorce laws. At best the statement is dicta and at worst an incorrect analysis of Guam's marriage laws. *Cf. Lujan v. Quinata*, 2014 Guam 20 ¶ 19.

may look to legislative history and other sources. *In re Leon Guerrero*, 2005 Guam 1 ¶ 31 (citing *People v. Angoco*, 1998 Guam 10 ¶ 5). Where—as here—the statute was adopted from another jurisdiction, these "other sources" include case law from the originating jurisdiction. *Id.* ¶¶ 31-34 (treating California case law as persuasive because statute in question was adopted from California).

[46]    Section 3105 states that "[i]n no case can a marriage of either of the parties during the life of the other, be valid in Guam, if contracted within one (1) year after the entry of an interlocutory decree in a proceeding for divorce." 19 GCA § 3105(a). We find this section ambiguous because—when looking to the provisions of the whole law, and to its object and policy—its terms are susceptible to more than one reasonable interpretation. As the Superior Court articulated, "*One way* to harmonize the language of both statutes is to recognize that a foreign marriage is valid under section 3107 as long as it still falls within the parameters of section 3105." RA, tab 91 at 8 (Dec. & Order) (emphasis added). However, another reasonable interpretation is that section 3105 affects only subsequent marriages contracted in Guam and does not operate to invalidate marriages in other jurisdictions. Appellant's Br. at 19.

[47]    This section was adopted almost verbatim from California Civil Code section 61 (1949). It has remained on the books unchanged, save for stylistic changes in 2015 that made the language gender neutral. Guam Pub. L. 33-065:5 (Aug. 24, 2015). When California amended its waiting period in 1965 so that it began running from the day the complaint was served, it left section 61 untouched. *In re Marriage of Frapwell*, 125 Cal. Rptr. at 880-81; 1965 Cal. Stat. 2754. This created a mismatch in California law between the waiting period to enter a final judgment and the waiting period to remarry, which Guam law now replicates.

**[48]**    California courts have held that temporal prohibitions on remarriage fall into two categories:

> The effect of a statute requiring parties in a divorce proceeding to wait a stated period of time after rendition of the divorce decree before entering into marriage with another person, depending upon the language used therein, generally is either (1) to prohibit the subsequent marriage and invoke a prescribed penalty for violation without affecting its validity, or (2) to maintain the former marriage in force for the stated period and thus render void any subsequent marriage contracted within that time.

*Jones v. Jones*, 5 Cal. Rptr. 803, 804 (Dist. Ct. App. 1960). Before the amendment in 1965, California's waiting periods on remarriage and entry of final judgment mirrored each other, and the effect was to maintain the former marriage in force for the stated period. *See id.* at 804-05; *Grannis v. Superior Court*, 79 P. 891, 892-93 (Cal. 1905).

**[49]**    It does not seem that California appellate courts were tasked with interpreting the effect of section 61 after the waiting periods became mismatched because the California legislature quickly realized the discontinuity and amended section 61 in 1967. *See* A.B. 597, 1967 Leg., Reg. Sess. (Cal. 1967) ("Permits a divorced person to remarry within one year after the service of copy of summons and complaint upon the defendant spouse rather than one year after the entry of an interlocutory decree, thereby reflecting change in interlocutory period made in 1965."). Section 61 was amended in 1967 to bring it into conformity with the new waiting period that began with the filing of the complaint:

> A subsequent marriage contracted by any person during the life of a former husband or wife of such person, with any person other than such former husband or wife, is illegal and void from the beginning, unless:
>
> > 1. The former marriage has been annulled or dissolved, and, in the case of dissolution by divorce obtained in this state, at least one year has elapsed from the date of service of a copy of summons and complaint upon, or appearance by, the defendant spouse in the former proceeding for such divorce.

1967 Cal. Stat. 2808; *see also* Cal. Civ. Code § 4401 cmt. (West 1992).

**[50]**    Although *I Liheslaturan Guåhan* followed California's lead by amending Guam's waiting period for entry of final judgment in 1984, P.L. 17-081:29, it has yet to similarly address the mismatch between sections 8322 and 3105. This raises the possibility of a repeal by implication because where provisions in two acts are in irreconcilable conflict, an implied repeal of the older[8] statute can properly be found. *See Sumitomo Constr.*, 2001 Guam 23 ¶ 16. Repeals by implication are disfavored, however, and a court should avoid a finding of implied repeal if the two statutes can be reconciled. *Id.* Although we have grave doubts about the legal force of section 3105, no party has asked us to find that it has been repealed by implication. As our decision does not turn on section 3105's implied repeal, we reserve resolution of this issue for a future case. *Cf. In re Request of Camacho*, 2004 Guam 10 ¶ 41 n.9.

### 2.    Section 3105 has no extraterritorial effect in this case

**[51]**    Even if we assumed that section 3105 has the force of law, although Joaquin could not have contracted a valid marriage in Guam within a year of his interlocutory divorce decree being entered, this statutory prohibition did not have the extraterritorial effect of prohibiting his marriage in a foreign jurisdiction. The Restatement approach to conflict of laws is persuasive on this issue:

> More frequently, the prohibition against remarriage contained in the statute of the divorce state, or in the divorce decree itself, does not affect the finality of the divorce decree, but is intended only to prohibit one or both of the parties from remarrying for a given period of time. Such a prohibition will not affect the validity of a remarriage contracted in another state except when the divorce is rendered in the state where the party against whom the prohibition was directed was domiciled at the time of and immediately following the remarriage. In such a case, the remarriage will be invalid, even though it satisfies the requirements of the state

---

[8] Although section 3105 has been updated more recently than section 8322, this update was a minor stylistic modification that was a small part of a sweeping change to Title 19. *See* P.L. 33-065:2 (Aug. 24, 2015) ("*I Liheslaturan Guåhan* recognizes that on June 5, 2015, the U.S. District Court of Guam ruled that the existing marriage laws on Guam are unconstitutional as it relates to same sex marriage. Pursuant to this ruling, *I Liheslaturan Guåhan* intends to comply with the U.S. District Court of Guam judgement [sic] and amend local statutes to allow for same-sex marriage on Guam."). The amendment changed only the phrase "husband or wife" to "spouse," and made no other substantive changes to section 3105. *Id.* § 5. Other courts have found that mere stylistic changes do not affect their implied-repeal analysis. *See Fratzke v. Pung*, 378 N.W.2d 112, 114 (Minn. Ct. App. 1985); *Hughes Elecs. Corp. v. Citibank Del.*, 15 Cal. Rptr. 3d 244, 257 (Ct. App. 2004).

where it was contracted, if, but only if, this result is required by the strong policy of the state where the divorce was rendered. Except when required to do so by statute, the courts of the divorce state would rarely apply a local prohibition of this sort to invalidate an out-of-state marriage. If the prohibition was directed against one party alone, such as when the guilty party is forbidden to marry his paramour, the courts of the divorce state would be motivated in part by the notion that such a prohibition should be strictly construed since it is in the nature of a penalty. But even when the prohibition cannot properly be considered a penalty, such as when it prohibits both parties from remarrying and is intended to protect the institution of marriage by deterring quick remarriages, the courts of the divorce state would rarely apply their local rule to invalidate an out-of-state remarriage by one of the parties that was contracted within the forbidden time. These courts would rarely apply their rule, because they usually would find that the policy embodied in the rule is not sufficiently strong to outweigh the general policy which favors upholding the validity of marriages.

Restatement (Second) of Conflict of Laws § 283 cmt. l (Am. L. Inst. 1971).

[52]     Under the Restatement approach, the prohibition on remarriage in section 3105 would not affect the validity of Joaquin's marriage to Elizabeth because he was domiciled in the Philippines. Furthermore, this result is not required by the strong public policy of Guam: rather than being required by statute to apply this local prohibition to invalidate foreign marriages, courts of Guam are compelled by statute to recognize otherwise valid foreign marriages.

[53]     The parties disagree about the persuasive value of various California cases interpreting several iterations of section 61. In construing an early version of section 61 of the California Civil Code before the adoption of an interlocutory waiting period, California courts held it to have no extraterritorial operation because it merely imposed a penalty. *In re Wood's Estate*, 69 P. 900, 901-02 (Cal. 1902) (in bank); *Mohn v. Tingley*, 217 P. 733, 736 (Cal. 1923) (in bank).[9] Courts interpreting section 61 after it was amended to reflect the imposition of a mandatory waiting period between the entry of interlocutory and final judgment found it had extraterritorial effect because

_____

[9] Although *Mohn* was decided after *Grannis*, it dealt with a divorce that occurred in 1900. *Mohn*, 217 P. at 736.

its purpose was to maintain the former marriage in force for the stated interlocutory period. *Grannis*, 79 P. at 894.

[54]    The proper analysis of Guam's current statute looks to the language of section 3105 to determine whether it imposes a penalty, as in *In re Wood's Estate*, 69 P. 900 (Cal. 1902), and *Mohn v. Tingley*, 217 P. 733 (Cal. 1923), or a waiting period, as in *Grannis v. Superior Court*, 79 P. 891 (Cal. 1905):

> The effect of a statute requiring parties in a divorce proceeding to wait a stated period of time after rendition of the divorce decree before entering into marriage with another person, depending upon the language used therein, generally is either (1) to prohibit the subsequent marriage and invoke a prescribed penalty for violation without affecting its validity, or (2) to maintain the former marriage in force for the stated period and thus render void any subsequent marriage contracted within that time. The statute of another state which imposes only a prohibition upon a subsequent marriage within the designated waiting period constitutes the adoption of a policy which will not be enforced extraterritorially in this state. *In re Wood's Estate*, 69 P. 900, 902 (Cal. 1902); *In re Winder's Estate*, 219 P.2d 18, 98 Cal. App. 2d 78, 87 (Dist. Ct. App. 1950); *People v. Woodley*, 136 P. 312 (Cal. Dist. Ct. App. 1913). On the other hand, where the statute of another state continues the marriage of parties to a divorce proceeding in force during the prescribed period after rendition of that decree, it determines the status of the parties during that time, and controls the decision of the courts of this state when their status is in issue even though it also effects a waiting period policy.

*Jones*, 5 Cal. Rptr. at 804-05.

[55]    Because of our holding that the interlocutory decree establishes the rights of a party, along with the mismatch between the waiting periods in sections 3105 and 8322, to the extent section 3105 is still in effect, it imposes a mere penalty that is not extraterritorial. Elizabeth's marriage to Joaquin was valid under the substantive law of the Philippines because the prohibition on remarriage in section 3105 had no extraterritorial effect on their marriage celebrated in the Philippines. The effect of the interlocutory decree (coupled with a retroactive final judgment) was to capacitate him to marry as of January 16, 2008. Elizabeth's other arguments regarding laches and the presumption of marriage are moot because we find that her marriage was valid.

## V. CONCLUSION

[56]     The Superior Court did not err when it concluded the heirs had standing to challenge the validity of Elizabeth's marriage and it had jurisdiction to determine the issue.  However, the court erred in failing to determine what legal framework applied to a remarriage in the Philippines following a Guam divorce.  We hold that the legal effect of Joaquin's Guam interlocutory divorce decree was to capacitate him to remarry as of January 16, 2008, and 19 GCA § 3105 had no extraterritorial effect to bar Joaquin's marriage to Elizabeth in the Philippines.  We **REVERSE** the probate court's order granting Patrick's motion for summary judgment and denying Elizabeth's motion for summary judgment.  This matter is **REMANDED** for further proceedings not inconsistent with this opinion.


/s/
KATHERINE A. MARAMAN
Associate Justice

/s/
JOHN A. MANGLONA
Justice *Pro Tempore*


/s/
F. PHILIP CARBULLIDO
Presiding Justice